633 S.E.2d 779

**COMMUNITY ANTENNA SERVICE, INC., Appellant,**

v.

**PUBLIC SERVICE COMMISSION OF WEST VIRGINIA, and Charter Communications, VI, LLC, Appellees.**

No. 31767.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 18, 2005.

Decided June 30, 2006.

Robert W. Full, Goodwin & Goodwin, LLP, Parkersburg, for Appellant Community Antenna Service, Inc.

Raymond S. Franks, II, Goodwin & Goodwin, LLP, Charleston, for Appellant Community Antenna Service, Inc.

Cynthia L. Wilson, Richard E. Hitt, Esquire, Charleston, for Appellee Public Service Commission of West Virginia.

H. Wyatt Hanna, III, Hanna & Page, Attorneys at Law, South Charleston, for Appellee Charter Communications, VI, LLC.

Robert G. Scott, Cole, Raywid & Braverman, LLP, Attorneys at Law, Washington, DC, Pro Hac Vice for Appellee Charter Communications, VI, LLC.

BENJAMIN, Justice:

This case is before the Court upon the appeal of Community Antenna Service, Inc. ("CAS") from the February 10, 2004, and March 23, 2004, orders of the appellee, Public Service Commission of West Virginia ("PSC" or "Commission"), in its Case No. 01–0646–CTV–C. In its February 10, 2004, order, the PSC ruled that special "reduced or promotional rates" offered by the appellee, Charter Communications VI, LLC ("Charter"), to customers in certain "defined customers categories" for its cable service in Parkersburg and rural Wood County, West Virginia, were reasonable and not discriminatory. These special "reduced or promotional" rates, or special pricing plans, were not offered by Charter to most of its existing customers. Rather, the reduced rates were only offered to current CAS customers and to Charter customers who were seeking to change from Charter to CAS. Charter also offered reduced rates to satellite customers, customers in new areas, and to Charter customers who sought to end or reduce their service from Charter. In its February 10, 2004 order, the PSC also determined "that the sixty-day advance notice of any rate changes [required by its *Cable Rule* 9.2] does not apply to discounts or promotional rates such as those [offered by Charter]."

In issuing its February 10, 2004, order, the PSC refused to adopt an August 19, 2002, Recommended Decision of an Administrative Law Judge, who, after reviewing the relevant facts and law, determined that Charter's special pricing plans "unduly discriminate in favor of certain customers [since] [o]nly customers who have CAS service available and either leave Charter or threaten to leave Charter for CAS are offered the plans." The Administrative Law Judge also determined that, by failing to timely notify the PSC of

the reduced rates in their special pricing plans, Charter had not complied with the PSC's *Rules and Regulations for the Government of Cable Television* Rule 9.2.[1]

Specifically, with respect to rates, the PSC ruled in its February 10, 2004 order: (1) "that Charter has reasonably defined customer categories that are the target of its reduced or promotional rates;" (2) "that offering reduced or promotional rates to customers in such categories is reasonable and not discriminatory;" (3) that "[t]he promotional offers in the Parkersburg/Wood County area have created an environment of more competition and [have] resulted in lower prices to consumers;" and (4) that "it is not the Commission's role to dictate market strategy in these competitive situations, particularly when the effect is benefitting [sic] the public." The Commission further ruled that the non-discrimination provisions of federal law apply to all cable rates, but that the uniform rate structure requirement provisions of federal law apply only to regulated or basic cable rates.

The PSC's subsequent March 23, 2004, order was issued in response to its own Staff's review of the February 10, 2004, order. By motion, the Staff asked the PSC to reconsider its February 10, 2004, order. The Staff believed that the PSC's Conclusion of Law No. 1 in the February 10, 2004, order misstated federal law; that the federal requirement of a uniform rate structure applies not just to basic cable service, as the Commission had ruled, but to all tiers of cable service; that Charter's reduced or promotional rates were neither promotional nor reasonable in that they were not universally applied or temporary; that Charter's reduced or promotional rates had not resulted in lower prices to consumers; and that Charter should be required to notify the PSC of all rate changes. The Commission's March 23, 2004, order rejected all of its Staff's arguments except one: The Commission restated its Conclusion of Law No. 1 to note

that at the time of passage of the Federal Cable Act, the Federal Communications Commission ("FCC") had jurisdiction to implement rate regulation of non-basic tiers of cable service, but that such authority had ended on March 31, 1999.

CAS contends in this appeal that the special pricing plans offered by Charter were "unduly discriminatory" and that the PSC should have ordered Charter to cease such practice as it is authorized to do under the provisions of W. Va.Code § 24D–1–13 (1999). CAS now asks this Court to remand the case to the PSC and direct it to enter the August 19, 2002, recommended decision of the Administrative Law Judge, modified to void Charter's existing CAS-related special pricing plans, and to consider the imposition of fines and penalties against Charter. In essence, CAS complains that, because of its size and presence in the market, Charter is engaging in marketing activities designed not to enhance competition, but to limit it. In other words, CAS contends, Charter has used rates which are unreasonably low, below that for which CAS can deliver the services, to target CAS customers and CAS potential customers and, thereby, impair the competition which CAS contends its entry into the Parkersburg market represents. In doing so, CAS argues that the vast majority of Charter customers and potential customers have seen and will see no benefit from the competition which CAS's entry into the Parkersburg market represents.[2]

Charter, on the other hand, contends that CAS's customers constitute a permissible sub-classification of potential and existing subscribers and that Charter had rationally defined categories of subscribers for its special pricing plans. Thus, Charter states that the PSC was correct in concluding that the customer categories to whom it offered its special pricing plans with reduced rates were reasonably defined and that the rates so offered to such customers and potential customers in such categories were reasonable

---

1. 150 C.S.R. Series 26.

2. CAS also asserts that while Charter has reduced rates for CAS-related customers and potential customers, this number of customers and potential customers is relatively small compared

to Charter's customer base. CAS notes that rates for the majority of Charter's customers have risen significantly during the time period at issue in this case.

and not discriminatory. Charter asserts that the competition for cable and related services in Parkersburg and Wood County has been enhanced and that CAS is simply attempting itself to stifle such competition and thereby obtain an unfair advantage by this litigation. The PSC, in its brief, supports most of Charter's positions.

This Court has before it the petition for appeal, all matters of record, the briefs of the appellant, CAS, and of the appellees, Charter and PSC, and has heard the oral argument of counsel. For the reasons stated below, the PSC's orders of February 10, 2004, and March 23, 2004, are reversed, and this case is remanded to the PSC for proceedings consistent with this opinion.

## I.

### FACTS AND PROCEDURAL BACKGROUND

Prior to 1999, CAS and Charter each provided cable television service within Wood County, West Virginia. CAS provided service primarily in rural Wood County[3] and Charter provided service primarily in the City of Parkersburg. Each company pro-vides slightly different cable services. Channel availability is different, and cable packages are different. For example, CAS's basic cable package has 60 channels. Charter's basic tier of service has approximately 21 channels,[4] and its extended basic tier of service has 70 channels. Charter and CAS did not compete directly against each other.

In 1999, CAS decided to compete directly with Charter and provide cable television service in the City of Parkersburg.[5] CAS borrowed money and began constructing its own cable system in Parkersburg. CAS also solicited potential new customers, including customers then-served by Charter, by a variety of special pricing plans, including free installation.[6] CAS's special pricing plans were universally applicable to all potential new customers.

Charter responded to the competition offered by CAS in Parkersburg by expanding its cable service availability to the most densely populated parts of rural Wood County, thereby overbuilding many areas already served by CAS.[7] As part of its response to CAS, Charter developed special pricing plans, known as "CAS Buy–Back plans."[8]

---

3. CAS had facilities to serve about 3,000 customers in rural Wood County. About 2,000 of the potential customers subscribed to CAS's service.

4. The record is not entirely clear as to the number of channels offered in Charter's basic service. The hearing testimony and ALJ findings agree that the number is "substantially less" than that offered by CAS. This Court's review of the record uncovered a Charter advertisement indicating its basic service consisted of 21 channels, including mainly network and public broadcasting stations.

5. In overbuilding the territory previously served only by Charter, CAS expected to build about 100 miles of cable and estimated that it would need to attract 10–15 percent of the potential new customers.

6. CAS advertising directly compared its prices and services to Charter's, and stressed its family-oriented programming. CAS also stressed that it was locally owned and operated. In addition to free installation for new customers who already had cable or satellite service, CAS offered a free trial period of 30–days of service for the first 30–40 days during which it began service to newly built areas. From time to time, premium channels would offer CAS reduced prices, and CAS would pass those price reductions through to its customers.

7. Since expanding into Parkersburg, CAS's cable passes approximately 10,000 homes, of which 800 subscribe. CAS's cable does not pass approximately 5,000 Parkersburg homes. Charter cable now passes 2,000 to 3,000 rural homes in Wood County, and serves 500 to 600 of them. Charter passes nearly all of the 15,000 homes in Parkersburg and serves more than 12,000 of them. Since they began directly competing against each other, CAS has taken about 701 customers from Charter, and Charter has taken about 696 customers from CAS.

8. Charter developed several CAS-related special pricing plans. In total, Charter had eight special pricing plans targeted to CAS customers and potential customers. Each promised significant savings from Charter's regular rates for cable services. One such plan provided customers with basic and expanded basic cable service for $29.95 per month. This plan gave the customer a $200.00 check and provided free installation. A 12 month commitment was required. A variation of this special pricing plan provided for a $200.00 credit to the customer instead of a check. The effective monthly service rate under each of these special pricing plans was $13.28 per month. Another special pricing plan provided the basic tier of service, extended basic tier of service, and a digital MVP package for $9.95 per

These special pricing plans were directly targeted at enticing customers then-served by CAS to switch their cable service to Charter and at maintaining Charter customers who were leaving, or threatening to leave, Charter for CAS service. The prices which Charter offered to these customers were lower than the prices Charter charged to its other area customers for cable service.[9] These special pricing plans were not available to customers without some nexus to CAS. Charter marketed these special pricing plans through door-to-door salespeople, rather than universally through the print or broadcast media. Charter also, on occasion, agreed to continue the special pricing plans after the initial period. Charter's practice was to meet or beat CAS's prices for these targeted customers and potential customers.

On May 11, 2001, CAS filed a formal complaint against Charter with the PSC claiming that the special pricing plans offered by Charter were "unduly discriminatory" as that term is used in W. Va.Code § 24D–1–13(b), and that such pricing plans had damaged CAS and competition in Wood County. CAS argued that Charter's "unduly discriminatory" pricing plans should be prohibited by the PSC pursuant to its authority over such matters. CAS also claimed that Charter had violated the Commission's rules by failing to provide the Commission notice of its special pricing plans.

The focus of CAS's complaint was Charter's CAS-related special pricing plans. These special pricing plans became known as

"reduced or promotional rates" in the PSC's order of February 10, 2004. The "customer categories" to which such rates were offered were characterized by that order as including satellite customers (featuring a dish buy-back program) and customers in new service areas, in addition to current CAS customers and Charter customers seeking to change providers from Charter to CAS or to reduce service.

After the taking of evidence, CAS's complaint was considered and resulted in the ALJ's Recommended Decision of August 19, 2002, the PSC's order of February 10, 2004, and the PSC's order of March 23, 2004. In his Recommended Decision dated August 19, 2002, the Administrative Law Judge accepted CAS's arguments and found that Charter failed to rebut the presumption that there is no "effective competition" in the Parkersburg-area. He recommended that the PSC conclude that Charter's special pricing plans unduly discriminated in favor of certain Charter customers and that Charter violated Cable Rule 9.2 requiring notice of certain rate changes by cable system operators. He further found that Charter's special pricing plans did not constitute a permissible promotional offer because such plans were not universally applied or were temporary in nature. The Administrative Law Judge recommended that Charter be ordered to cease and desist from offering such targeted special pricing plans and that Charter be required to notify the PSC of any changes in their cable rates.[10]

month, with free installation. A 6 month commitment was required. In yet another plan, for CAS customers who left Charter owing money to Charter, Charter agreed to forgive 50% of the arrearage so long as the customer agreed to leave CAS and return to Charter.

9. During the relevant time herein, Charter's rates for its basic tier of service in Parkersburg and surrounding Wood County increased approximately 3%, from $11.84 to $12.20, from June 1, 1999 to May 1, 2000. From May 1, 2000 to March 1, 2002, the rate for basic service increased from $12.20 to $15.95, representing an average annual increase of approximately 15.4%. For Charter's expanded basic tier of service for the same area, the rate increased from $19.13 to $20.77, from June 1, 1999 to May 1, 2000, representing an increase of approximately 8.6%. From May 1, 2000 to March 1, 2002, the rate for

expanded basic service increased from $20.77 to $24.00, representing an average annual increase of approximately 7.8%.

10. Charter offered a witness, Patricia Kravtin, to testify about the issue of effective competition in Wood County. Ms. Kravtin discussed competition not only between CAS and Charter, but also from satellite services such as Dish Network and DirectTV. The Administrative Law Judge did not find this testimony persuasive based upon specific findings of inadequacies in Ms. Kravtin's underlying data. Specifically, the Administrative Law Judge found that Ms. Kravtin had not undertaken an "effective competition" study of the Parkersburg-area and did not have specific numbers for the penetration of the Parkersburg-area market by alternative providers. CAS apparently did not have an opinion witness.

CAS excepted to the Recommended Decision, asked that Charter be prohibited from continuing to serve customers who switched service back due to the special pricing plans, and that the PSC impose fines or civil penalties upon Charter. Charter excepted, arguing that the Administrative Law Judge incorrectly interpreted the anti-discrimination provisions of state and federal law and that the Recommended Decision imposed an inappropriate uniform rate requirement for unregulated cable service. Charter also argued that it had not violated *Cable Rule* 9.2.

In its February 10, 2004, order, the PSC rejected the Recommended Decision, and accepted Charter's position. The PSC decided that the critical question was whether Charter's practices constituted undue discrimination. The PSC concluded that federal law permits a cable system operator to have different rates among "reasonable categories of subscribers based on justifiable differences in economic benefits the operators derive from serving such categories." [11] The PSC also determined that federal law permitted introductory or promotional rates so long as they were universally applied at a given time and later discontinued. Concluding that all that CAS had demonstrated was that Charter had engaged in the use of non-uniform rates, the PSC concluded that discrimination had not been shown. In doing so, the PSC concluded that Charter had targeted reasonable categories of subscribers. Finally, the PSC concluded that *Cable Rule* 9.2 required operators to notify the PSC of any rates changes, decreases or increases; but that the advance notice requirements applied only to changes in standard, non-promotional rates, not to discounts and promotional rates.

The PSC's Staff asked for a reconsideration of the February 10, 2004, order, citing a number of possible errors in the order. By order of March 23, 2004, the PSC issued a new order in which it clarified when local franchising authorities acquired jurisdiction to implement rates rules for basic tier rates. The PSC rejected most of the cited errors by its staff. CAS now appeals to this Court.

## II.

### STANDARD OF REVIEW

 CAS seeks our review of the PSC's February 10, 2004, and March 23, 2004, orders. " 'The detailed standard for our review of an order of the Public Service Commission contained in Syllabus Point 2 of *Monongahela Power Co. v. Public Service Commission*, 166 W.Va. 423, 276 S.E.2d 179 (1981), may be summarized as follows: (1) whether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's findings; and, (3) whether the substantive result of the Commission's order is proper.' Syl. Pt. 1, *Central West Virginia Refuse, Inc. v. Public Service Commission*, 190 W.Va. 416, 438 S.E.2d 596 (1993)." Syl. Pt. 3, *The Affiliated Construction Trades Foundation v. The Public Service Commission of West Virginia*, 211 W.Va. 315, 565 S.E.2d 778 (2002). Furthermore, "[A]n order of the public service commission based upon its findings of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles." Syl. Pt. 1, *Affiliated Constr. Trades Found.* (internal citations omitted). With these standards in mind, we turn to the issues presented herein.

## III.

### DISCUSSION

#### A. Preface

The issues presently before this Court require us not only to consider the record below, but also to navigate a complex maze of interrelating applicable federal and state laws. Central to our consideration of these issues are the national policy concerns and interests expressed by Congress concerning competition within cable systems and the exercise of state authority with respect to the regulation of such systems. To the extent that a state such as West Virginia is authorized by federal law to regulate cable systems

---

11. *See In the Matter of Implementation of Section of the Cable Television Consumer Protection and* *Competition Act of 1992 Rate Regulation*, 8 F.C.C.R. 5631 (1993).

within its borders, we must determine not only the source of the authority for an administrative body, such as the PSC, to regulate cable systems, but also our Legislature's intentions with respect to the exercise of that authority.

"We turn first to Federal authority. In addition to establishing a national policy concerning cable communications, Congress expressed several other purposes in enacting cable-service legislation,[12] including the establishment of guidelines for the exercise of ... State ... authority with respect to the regulation of cable systems." 47 U.S.C. § 521(1), (3) (1984). Congress also sought to "promote competition in cable communications and minimize unnecessary regulation that would impose an undue economic burden on cable systems." 47 U.S.C. § 521(6) (1984).

We begin our consideration of the issues herein with the recognition that federal statutes are preeminent and our State statutes are subordinate.[13] West Virginia may, therefore, regulate the rates of cable operators only to the extent permitted by federal law. 47 U.S.C. § 543(a)(1) (1996). Accordingly, in considering the PSC's proper exercise of authority under the statutes and regulations of West Virginia, we must also examine federal law, regulations, and guidelines relating to cable service, especially as they relate to the authority given to states to regulate the rates of cable operators and to prohibit cable operators from discriminating among subscribers and potential subscribers in the rates they charge for cable service.[14]

## B. The Authority of the PSC in the Regulation of the Cable Industry

In 1999, the regulation of cable operators in West Virginia was delegated by the Legislature to the PSC by statute:

> (b) To the extent permitted by federal law, the board shall regulate rates to ensure that they are just and reasonable both to the public and to the cable operator and are not unduly discriminatory.
>
> (c) To the extent permitted by federal law, the commission shall regulate charges other than those related to rates for the provision of basic cable service to ensure that they are just and reasonable and not unduly discriminatory.

W.Va.Code § 24D–1–13 (1999).[15] In establishing this delegation of power to the PSC, the Legislature found that

> [I]t is in the public interest ... to establish just, reasonable and nondiscriminatory rates and charges for the provision of cable service to the extent that the service is not subject to effective competition. The purpose of the article is to promote such goals by all available means not in conflict with federal law, rules or regulations.

W. Va.Code § 24D–1–1 (1999).[16] From the inception of the West Virginia Cable Televi-

---

**12.** The national policy established by Congress concerning the the regulation of cable systems is set forth in three Acts of Congress: the Cable Communications Policy Act of 1984, Pub.L. No. 98–549, 98 Stat. 2788; the Cable Television Consumer Protection and Competition Act of 1992, Pub.L. No. 102–385, 106 Stat. 1460; and the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56, Title III, Cable Service. The 1984 Act to the extent not amended by the 1992 and 1996 Acts, the 1992 Act to the extent not amended by the 1996 Act, and the 1996 Act are codified in scattered sections of Title 47 of the United States Code.

**13.** With one exception not relevant to this appeal, Congress has declared that "any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is inconsistent with [the national policy concerning cable communications] shall be deemed to be preempted and superseded." 47 U.S.C. § 556(c) (1996).

**14.** As acknowledged by the parties, we recognize that there is no direct judicial precedent from this or any other jurisdictions to which we may turn for guidance on the core issues in this case.

**15.** In 1990, the Legislature enacted the West Virginia Cable Television Systems Act ("WVCTSA") codified as W.Va.Code § 5–18–1, et seq. The West Virginia Cable Television Advisory Board ("Cable Board") was established that year to administer the provisions of the WVCTSA. The Legislature disbanded the Board in 1998. Effective June 11, 1999, the regulation was delegated to the PSC and the WVCTSA was recodified from W.Va.Code § 5–18–1, et seq. (1990), to W.Va.Code § 24D–1–1, et seq. (1999). The re-enacted provisions were, substantively, virtually identical.

**16.** The findings of the Legislature set forth in W.Va.Code § 24D–1–1 (1999) are identical to those originally set forth in W.Va.Code § 5–18–1 (1990), when the Cable Board was designated to administer WVCTSA.

sion Systems Act in 1990, three primary policies are apparent in the Legislature's charge to the PSC: (1) that the PSC regulate cable service rates to the extent permitted by federal law; (2) that rates and charges for cable service be reasonable and nondiscriminatory to the extent that the service is not subject to effective competition; and (3) that rates be just and reasonable both for customers and cable operators. The Legislature did not define "effective competition."

With respect to complaints which could be filed for determination by the PSC, the Legislature made an important change in 1999. In the West Virginia Television Systems Act of 1990, the Legislature permitted complaints involving the operation of cable systems to be filed by "subscriber[s]." W. Va.Code § 5–18–25 (1990). In 1999, the Legislature broadened the standing necessary to file a complaint by amending the statute to permit complaints to be filed by "affected parties." W. Va.Code § 24D–1–22 (1999).

In view of this limited empowerment of the PSC by the Legislature with respect to the resolution of complaints regarding cable operators in West Virginia, we necessarily must look to federal statutes and regulations for the underlying authority which CAS contends requires the PSC to act herein. Central to our consideration of this case is the federal law requiring uniform rates in given geographic areas and prohibiting rate discrimination among customers in those same geographic areas.[17]

### C. The Uniform Rate Structure Requirement

Initially, CAS asserts that Charter's special pricing plans at issue herein were neither just nor reasonable and that the PSC was obligated pursuant to W.Va.Code §§ 24D–1–

13(b) and (c) to prohibit such special pricing plans. Specifically, CAS argues that Charter's special pricing plans represent rates which were not uniform to those charged to other Charter customers in the Wood County geographic area; and, therefore, West Virginia law requires the PSC to regulate such plans consistent with the "Uniform Rate Structure" requirement set forth at 47 U.S.C. § 543(d). In making this argument, CAS asserts that Charter's special pricing plans do not constitute bona fide reduced or promotional rates because they were not universally applied at a given time and were not subsequently discontinued (*i.e.*, they were not temporary).

Charter responds that the special pricing plans at issue are not subject to regulation by the PSC under 47 U.S.C. § 543(d) because the plans include non-basic services which are not subject to regulation (*i.e.*, deregulated services).[18] The PSC agrees with Charter, arguing that the uniform rate provision applies only to regulated services;[19] that only the basic tier of services may be regulated; and that it could apply the uniform rate provision to Charter's basic service tier, but not to its other service tiers.

The "Uniform Rate Structure" provision at issue herein is found at 47 U.S.C. § 543(d). Captioned "Uniform rate structure required," this statutory section provides:

A cable operator shall have a rate structure, for the provision of cable service, that is uniform throughout the geographic area in which cable service is provided over its cable system. This subsection does not apply to (1) a cable operator with respect to the provision of cable service over its cable system in any geographic area in

---

**17.** "[C]able companies operate within defined geographic regions based upon franchises awarded by the federal government under 47 U.S.C.A. § 541." *TV Communications Network, Inc. v. ESPN, Inc.*, 767 F.Supp. 1062, 1073 (D.Colo.1991). *See also, In the Matter of Implementation of Section of the Cable Television Consumer Protection and Competition Act of 1992 Rate Regulation*, 8 F.C.C.R. 5631, 5896 (1993) ("We conclude that a system's franchise area properly defines that "geographic area" within which uniformity of rate structures is mandated.")

**18.** "Basic cable service" is defined as "any service tier which includes the retransmission of local television broadcast signals." 47 U.S.C. § 522(3).

**19.** The PSC primarily relies upon *Time–Warner Entertainment Co. L.P. v. FCC*, 56 F.3d 151, 191 (D.C.Cir.1995), for this position. In *Time–Warner*, the court found the uniform rate requirement contained in 47 U.S.C. § 543(d) "applies only in the absence of 'effective competition.' " *Time–Warner*, 56 F.3d at 191.

which the video programming services offered by the operator in that area are subject to effective competition . . .

U.S.C. § 543(d). 47 U.S.C. § 543(d) provides only three specific exceptions to its requirement of rate structure uniformity, namely: (1) the offering of video programming services in any geographic area in which such programming services are subject to "effective competition;" (2) "any video programming offered on a per channel or per program basis;" and (3) "[b]ulk discounts to multiple dwelling units . . . except that a cable operator of a cable system that is not subject to effective competition may not charge predatory prices to a multiple dwelling unit." *Id.* This section appears to state that video programming not offered on a per channel or per program basis and not found by the FCC to be subject to "effective competition" is subject to the uniform rate structure requirement.[20]

To fully consider the applicability of this section, however, we must also consider applicable federal regulations. The FCC's regulation relating to "Geographically uniform rate structure," appears in 47 C.F.R. § 76.984 (1999), and provides as follows:

(a) The rates charged by cable operators for *basic* service, cable programming service . . . shall be provided pursuant to a rate structure that is uniform throughout each franchise area in which cable service is provided.

(b) This section *does not prohibit* the establishment by cable operators of *reasonable categories of service and customers* with separate rates and terms and conditions of service, within a franchise area.

(c) This section does not apply to:

(1) A cable operator with respect to the provision of cable service over its cable system in any geographic area in which the video programming services offered by the operator in that area are subject to effective competition.

(2) Any video programming offered on a per channel or per program basis.

(3) Bulk discounts to multiple dwelling units shall not be subject to this section, except that a cable operator of a cable system that is not subject to effective competition may not charge predatory prices to a multiple dwelling unit. Upon a prima facie showing by a complainant that there are reasonable grounds to believe that the discounted price is predatory, the cable system shall have the burden of showing that its discounted price is not predatory.

(Emphases added.)

In MM Docket 92–266, captioned "In the Matter of Implementation of Section of the Cable Television Consumer Protection and Competition Act of 1992 Rate Regulation," the FCC on April 1, 1993, adopted a "Report and Order and Further Notice of Proposed Rulemaking" reported in 8 F.C.C.R. 5631 *et seq.* ("FCC's Report and Order"). In dis-

---

**20.** The term "effective competition" is defined by federal law. 47 U.S.C. § 543(*l*)(1) provides:

(*l*) Definitions
As used in this section—
(1) The term "effective competition" means that-
 (A) fewer than 30 percent of the households in the franchise area subscribe to the cable service of a cable system;
 (B) the franchise area is-
 (i) served by at least two unaffiliated multichannel video programming distributors each of which offers comparable video programming to at least 50 percent of the households in the franchise area; and
 (ii) the number of households subscribing to programming services offered by multichannel video programming distributors other than the largest multichannel video programming distributor exceeds 15 percent of the households in the franchise area;

 (C) a multichannel video programming distributor operated by the franchising authority for that franchise area offers video programming to at least 50 percent of the households in that franchise area; or
 (D) a local exchange carrier or its affiliate (or any multichannel video programming distributor using the facilities of such carrier or its affiliate) offers video programming services directly to subscribers by any means (other than direct-to-home satellite services) in the franchise area of an unaffiliated cable operator which is providing cable service in that franchise area, but only if the video programming services so offered in that area are comparable to the video programming services provided by the unaffiliated cable operator in that area.

cussing the "Geographically Uniform Rate Structure" required by 47 U.S.C. § 543(d), the FCC stated:

> 421.... The general thrust of the rate regulation provisions of the Act is that as the markets involved became more fully competitive, regulation specific to the cable industry may be reduced and general provisions of the law relating to anti-competitive conduct more heavily relied on. *This suggests that Section 623(d)'s[ 47 U.S.C. § 543(d)'s] focus is properly on regulated services in regulated markets.*
>
> 423.... *The legislative history does not reveal any congressional intent to mandate a uniform rate for all services and classes of customers. Indeed, Section 623(d)* [47 U.S.C. § 543(e), the discrimination section] *specifically contemplates special categories of customers may receive separate rates. Accordingly, we conclude that Section 623(d)* [47 U.S.C. § 543(d)] *does not preclude establishment of reasonable categories of customers and service by cable operators.* Thus, for example, as suggested in the Notice, we do not believe that Congress intended a per se prohibition on differences in rates between seasonal and full-time subscribers. We also find that uniform, non-predatory bulk discounts to multiple dwelling units, including apartment buildings, hotels, condominium associations, hospitals, universities, and trailer parks, could form a valid basis for distinctions among subscribers. *Introductory or promotional rates universally applied at a given time but subsequently discontinued would also not be prohibited.*

8 F.C.C.R. at 5896–7 (Emphases added.).

In its order of February 10, 2004, the PSC concluded that Charter failed to demonstrate the existence of effective competition in the franchise areas at issue. This finding is not disputed. Therefore, pursuant to 47 U.S.C. § 543(d), Charter's rates for cable service may be subject to regulation by the PSC. The questions for us to determine are whether that regulation by the PSC may be for service beyond the basic tier of service and, if not, whether the PSC may regulate special service plans which are comprised only in part by the basic tier of service. We must also consider whether Charter's CAS-related special pricing plans fall within any of the exceptions recognized by federal law.

In its order of February 10, 2004, the PSC concluded that it may only impose the uniform rate rules upon Charter's basic tier of service. In light of the language contained in the federal regulations and FCC opinion and absent clear statutory authority to the contrary, we agree with the PSC's conclusion and find that the uniform rate requirement of 47 U.S.C. § 543(d) applies only to the basic tier of cable services. The uniform rate requirement does not apply to expanded or other non-regulated cable-related services.

Our consideration of the uniform rate requirement, however, does not end there. While we also agree that CAS-related special pricing plans at issue herein include unregulated cable-related services which are not subject to regulation by the PSC, we believe this case compels us to recognize a limited exception herein based upon the specific facts in the record regarding three of the CAS-related special pricing plans. Specifically, we note that at a time when Charter's basic service tier regularly cost its Wood County customers $14.00 and $15.95 per month, in two plans, one involving a $200 check and in another a $200 credit, the effective monthly rate of Charter's CAS-related special pricing plans were $13.28 per month. For a third CAS-related special pricing plan, the rate was $9.95 per month. The effective monthly price of these special pricing plans being lower than the regular basic tier monthly rate implicates, in our opinion, the uniform rate provisions of 47 U.S.C. § 543(d). Even if all non-basic cable service in these plans was free (which might raise a "discrimination" issue), one simply cannot escape the conclusion that the effective rate for basic service under these special pricing plans was lower than the regular basic tier service price for Charter's other customers, and is, therefore, not uniform in this geographic area.

With respect to these three special pricing plans, the PSC has an obligation to regulate unless such plans fall within any of the three exceptions to regulation specified in U.S.C. § 543(d). We find that they do not. There

has been no finding of "effective competition" in this case; these rates do not relate to per channel or per program programming; and these rates are not bulk discounted rates.

We must also consider whether these special pricing plans fall within an exception recognized within the rules of the FCC. Specifically, we must consider whether any of these three special pricing plans are excepted from regulation by 47 C.F.R. § 76.984(b), which permits cable operators to establish "reasonable categories of service and customers with separate rates and terms and conditions of service, within a franchise area." Furthermore, we must also consider the FCC's Report and Order, in which the FCC concluded that "[i]ntroductory or promotional rates universally applied at a given time but subsequently discontinued would also not be prohibited." 8 F.C.C.R. at 5897.

Here, and as we will discuss in our consideration below on the issue of rate discrimination, we find the PSC's conclusion that Charter had reasonably defined customer categories and that the special pricing plans were promotional in nature is not supported by the law or the record. The PSC, both in the text and in the conclusion of law of its February 10, 2004, order stated that its review should "focus upon" and "determine whether the categories of subscribers that were offered the discounted 'buy-back' by Charter are reasonable." After describing the nature of its inquiry as a Conclusion of Law and reciting the strategies Charter used to entice and/or maintain customers, the PSC immediately "conclude[d] that Charter has reasonably defined customer categories that are the target of its reduced or promotional rates" without further explanation or reasoning. We do not deem the PSC's statement in its ninth Conclusion of Law, namely, "[t]he promotional offers . . . have created an environment of more competition and has [sic] resulted in lower prices

to consumers," to be a legally sufficient explanation or rationale for its conclusions that the customer categories were reasonably defined.[21]

The PSC obviously relied upon the FCC's Report and Order and the FCC's regulation relating to uniform rate structure as the source of its wording "reasonably defined customer categories." The FCC used essentially the same wording in its regulation and in its Report and Order in discussing both uniform rate structure and rate discrimination. See 8 F.C.C.R. at 5896–5902. The FCC has not defined what it meant by "reasonable" although it did give some illustrations of "reasonable categories of subscribers" or practices, such as categories "based on justifiable differences in the economic benefits the operator derives from serving such categories" and "[i]ntroductory or promotional rates universally applied at a given time but subsequently discontinued." 8 F.C.C.R. at 5897, 5901–2. It may, therefore, be inferred that in order for separate categories of customers to be "reasonable," there must be a rational basis for establishing the categories.[22]

As stated above, the phrase "rational basis" is mentioned in the federal scheme concerning the providing of cable services by private entities. In that regard, we are not unmindful that the phrase "rational basis" is also associated with prohibited state imposed discrimination and violations of the principles of equal protection. While the latter use of that phrase and its related line of cases is instructive, it is not dispositive of the issues herein.

The decision of the Court of Appeals of Oregon in *TCI Cablevision of Oregon v. City of Eugene*, 177 Or.App. 433, 38 P.3d 269 (2001), *appeal denied*, 334 Or. 492, 52 P.3d 1057 (2002), is instructive on the issues of the reasonableness of customer "categories."

---

21. The PSC's conclusion that an environment of more competition was created is not supported by the record before this Court. The record clearly demonstrates that a very few customers benefitted from Charter's targeting of CAS customers and potential customers and the vast majority of Charter customers were forced to pay much higher rates for the same services.

22. Thus, in its discussion of the discrimination provision of 47 U.S.C. § 543(e), the FCC recognized in its Report and Order that cable operators have the discretion to create subcategories of economically disadvantage individuals "if a rational basis exists for such classification." 8 F.C.C.R. at 5901–2.

There, the court had to interpret a provision of 47 U.S.C. § 542 relating to franchise fees that a cable operator may be required to pay. The court noted that 47 U.S.C. § 542(g)(2)(A) (1991) defined the term "franchise fee" as not including "any tax, * * * of general applicability (including any such tax, fee, or assessment imposed on both utilities and cable operators or their services but not including a tax, * * * which is *unduly discriminatory* against cable operators or cable subscribers)." *TCI Cablevision,* 38 P.3d at 271 (emphasis added). In that case, a cable operator contended that the city's registration fee was unduly discriminatory again cable operators because the fee was not required of satellite and broadcast televisions providers. The court rejected the contention stating:

> To begin with, the statute does not prohibit all discrimination, only "undue" discrimination that "effectively constitute[s] a tax directed at the cable system." Accordingly, courts have upheld taxes of general applicability against discrimination challenges *as long as there is a rational basis for applying the tax to some businesses-including cable operators-and not others.* Thus, for example, in *Medlock,* the Supreme Court of Arkansas upheld a gross receipts tax that applied to cable operators but not to broadcast television stations. According to the court, differences in technology justified the distinction: Cable operators typically depend on sophisticated transmission systems, which, presumably, involve the use of city property, while broadcast transmission requires only a satellite dish. *Medlock,* 311 Ark. at 180, 842 S.W.2d at 431. *See also UACC Midwest,* 667 N.E.2d at 238–39 (upholding income tax that applied to cable operators but not to broadcast television companies).

> In this case, the city's telecommunications ordinance applies to all who provide "telecommunications service." The term is defined to exclude over-the-air radio or television from facilities that are licensed by the Federal Communications Commission. EC § 3.005. Although cable operators may transmit programming, much like television or radio broadcasters, they also may offer their facilities for interactive telecommunications use, in particular, Internet ac-

cess. *We conclude that there is at least a rational explanation for including cable transmissions within the definition of "telecommunications services," while excluding radio and television broadcasting. Id.* at 272 (emphasis added).

A cable provider, as a regulated entity providing services to the public, is somewhat similar to a public service corporation. As such, this Court's decision in *Elk Hotel v. United Fuel Gas Co.,* 75 W.Va. 200, 83 S.E. 922 (1914), provides a useful analogy to this case in that it recognizes that a public service corporation may classify its patrons and charge rates on each character of service provided that the rate does not give an undue or unreasonable preference or advantage to or make an unfair discrimination among it patrons and consumers under the same or substantially similar circumstances and conditions. The approach of the Oregon court in *TCI Cablevision* and of this Court in *Elk Hotel Co.,* as well as the FCC's recognition of "reasonable categories" of service and customers and of discretion given to cable operators to create subcategories of economically disadvantaged individuals "if a rational basis exists for such subclassification" suggest, and we find, that the uniform rate requirement codified at 47 U.S.C. § 543(d) (1996) requires a rational basis for the classification or categorization of cable customers where such classifications result in different treatment with respect to rates and/or services provided. This rational basis requirement is analogous to that imposed by the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and the equal protection guarantee inherent in the Due Process Clause of Art. III, Sec. 10 of the West Virginia Constitution for a rational basis to justify the disparate treatment of identifiable classes of citizens.

Charter's special pricing plans at issue herein were targeted to CAS customers and Charter customers who sought to cancel Charter services to become a CAS subscriber. The record before us does not demonstrate an economic benefit to Charter other than the stifling of competition in Parkersburg and Wood County. The lack of economic benefit to Charter for offering these

rates is demonstrated by the significantly higher rates imposed upon other Charter customers, the apparent willingness of Charter to extend the promotional rates beyond the introductory period where the customer indicated a desire to cancel coverage and the special pricing plan's result of pricing basic tier service below its approved basic tier service rate. We agree with the ALJ that, in these circumstances, Charter has failed to demonstrate that these special pricing plans were universally applied or temporary in nature.

With respect to Charter's CAS-related special pricing plans, which had effective prices below the rate of Charter's regular basic tier service price in the Wood County franchise area, we find that the PSC's orders of February 10, 2004, and March 23, 2004, are arbitrary and contrary to the evidence of record. The February 10, 2004, and March 23, 2004, orders misapply legal principles applicable to the issues in this case. Therefore, we reverse such orders and remand this case for application of the uniform rate requirement to these plans.

### D. The PSC's Duty to Prohibit Discrimination

CAS also asserts that Charter's CAS-related special pricing plans constituted discrimination among subscribers and potential subscribers to Charter's cable service and were, therefore, unduly discriminatory and in violation of W.Va.Code §§ 24D–1–13(b) and (c) (1999). CAS therefore argues that the PSC was obligated to prohibit Charter's CAS-related special pricing plans.

As with its authority to enforce uniform rates for basic tier cable services, the PSC's authority to ensure non-discriminatory cable rates in a franchise area requires us to again look to federal law. In prohibiting discriminatory rates, our Legislature has tasked the PSC with ensuring that cable rates "are just and reasonable both to the public and to the cable operator" to the extent permitted by federal law. W. Va.Code § 24D–1–13(b) (1999). However, the Legislature also provided that such rates should not be *unduly* discriminatory. *Id.* The Legislature did not define the term, "unduly." In setting forth the purpose of the Cable Television Systems

Act, the Legislature specifically found that it was in the public interest "to establish just, reasonable and nondiscriminatory rates and charges for the provision of cable service to the extent that the service is not subject to effective competition." W. Va.Code § 24D–1–1 (1999). This statutory language demonstrates that the Legislature did not intend to limit the PSC's purpose to simply preventing "unduly discriminatory" rates, but instead for the PSC to establish nondiscriminatory rates. The only qualification set forth to achieving this legislative purpose is the direction that the PSC establish such nondiscriminatory rates "by all available means not in conflict with federal law, rules or regulations." *Id.* The clear concern expressed by this statutory enactment is that discrimination not be tolerated in this state in areas where effective competition does not exist.

The federal statutory law applicable to our consideration of CAS' discrimination argument is found at 47 U.S.C. § 543(e) (1996), and reads:

> (e) Discrimination; services for the hearing impaired. Nothing in this subchapter shall be construed as prohibiting any . . . State . . . authority from (1) prohibiting discrimination among *subscribers and potential subscribers* to *cable service*, except that no . . . State . . . authority may prohibit a cable operator from offering reasonable discounts to senior citizens or other economically disadvantaged group discounts . . .

(Emphasis added). For purposes of determining the duty of the PSC in this case, this statutory language is important. Prior to amendments made in 1992, the federal statutory language relating to prohibiting cable service-related rate discrimination was much more limited, providing:

> (f) Nothing in this title shall be construed as prohibiting any Federal agency, State, or a franchising authority, from (1) prohibiting discrimination among customers *of basic cable service* . . .

47 U.S.C. § 543(f) (1984) (emphasis added).

The 1992 amendments to the Cable Act expanded the authority previously given to states to prohibit *"discrimination among*

*customers of basic service*" to the authority to prohibit "*discrimination among subscribers and potential subscribers to cable service.*" We note that 47 U.S.C. § 543(e) provides but two exceptions to the authority it gives to states to prohibit "discrimination among subscribers and potential subscribers to cable service"; namely, states may not prohibit "a cable operator from offering reasonable discounts to senior citizens or other economically disadvantaged group discounts." We likewise note that at no portion of the statute does Congress in any way delimit the term "discrimination."

The FCC's regulation relating to discrimination appears in 47 C.F.R. § 76.983 (2005).[23] It relates exclusively to the offering of reasonable discounts to senior citizens or to economically disadvantaged groups, and to the reception of cable service by hearing impaired individuals. Again, at no portion of the regulations does the FCC in its regulation delimit the term, "discrimination." The FCC has, however, also addressed this discrimination provision by stating:

> 430.... Cable operators will also have the discretion to create *subcategories of economically disadvantaged individuals*, so as to limit the scope of discounts that may be available, *if a rational basis exists for such subclassification....*

> 431. We also believe that the "discrimination" which [47 U.S.C. § 543(e) ] entitles federal, state and local authorities to prohibit *does not include reasonable categories of subscribers based on justifiable differences in the economic benefits the operator derives from serving such categories.* As stated in supra Section II.A.5.c., the local franchising authority and the Commission will address the reasonable-

ness of such categories as the need arises in concrete situations.

8 F.C.C.R. at 5901–02 (emphases added).

In reviewing federal law, we are at once confronted with an ambiguity in our State statute. Federal law speaks to "discrimination." Our State statutes speak to both "non-discriminatory rates" and "unduly discriminatory" rates. W. Va.Code §§ 24D–1–1 and 24D–1–13(b) and (c). In determining the measure of "discrimination" which our Legislature intended the PSC to regulate, we conclude that the "[t]o the extent" phrase which begins the statutory command of W. Va.Code §§ 24D–1–13 (b) and (c), together with the word "shall" within those same statutory subsections, obligates the PSC to regulate cable-related rates and charges to the full extent permitted by federal law. Anything less would, in our opinion, be inconsistent with our Legislature's express mandate set forth at W.Va.Code § 24D–1–13.

■ We likewise recognize the significance which must be placed on the expansion of the federal statutory "discrimination" language enacted by Congress in 1992. While the federal discrimination prohibition prior to 1992 was limited to existing customers of basic service, the 1992 amendments definitively expanded the federal discrimination prohibition to existing "and potential customers." With the added elimination of the term "basic" from the discrimination prohibition in 1992,[24] we must conclude that Congress intended the discrimination prohibition to have a much broader reach than the uniform rate provision. In its February 10, 2004, Order, the PSC adopted a broad interpretation of its discrimination prohibition obligation. We agree, and hold that 47 U.S.C. § 543(e) (1996) unambiguously expresses the intent of Congress to allow the PSC to review any of a

**23.** 47 C.F.R. 76.893 provides:

(a) No Federal agency, state, or local franchising authority may prohibit a cable operator from offering reasonable discounts to senior citizens or to economically disadvantaged groups.
 (1) Such discounts must be offered equally to all subscribers in the franchise area who qualify as members of these categories, or any reasonable subcategory thereof.

(2) For purposes of this section, members of economically disadvantaged groups are those individuals who receive federal, state or local welfare assistance.
(b) Nothing herein shall preclude any Federal agency, state, or local franchising authority from requiring and regulating the reception of cable service by hearing impaired individuals.

**24.** The 1996 amendments to the statute did not impact this provision.

**440**

cable operator's rates in order to prevent rate discrimination in a given franchise area.

■ Charter, however, argues that its special pricing plans fall into at least one of the several exceptions to discrimination found in federal law. 47 U.S.C. § 543(e) expressly provides for two exceptions to the prohibition of rate discrimination: reasonable discounts to senior citizens and other group discounts for the economically disadvantaged. Neither of these exceptions is applicable here. The FCC's regulations provide no other exceptions.

Charter argues that the additional exceptions [25] it relies upon may be found in the FCC's Report and Order, set forth above; namely, that a cable operator can create subcategories of economically disadvantaged individuals, if a rational basis exists for such subclassifications, and that a cable operator can create "reasonable categories of subscribers based on justifiable differences in the economic benefits the operator derives from serving such categories." 8 F.C.C.R. at 5901–2.

For the same reasons discussed in our consideration of the uniform rate issue above, we find that the PSC's conclusion that Charter had reasonably defined customer categories and that the special pricing plans were promotional in nature is legally unsupported. Neither the PSC nor Charter offer a rationale for the PSC's determination that former Charter customers who became CAS customers or who threatened to do so formed a reasonable category to whom discriminatory rates could be charged.[26]

In view of the facts contained within the record, and as we have discussed above, we agree with the Administrative Law Judge's conclusion that Charter's CAS-related special

pricing plans do not constitute a permissible promotional offer within the meaning of an exception to the rate discrimination prohibition set forth at 47 U.S.C. § 543(e). The FCC has indicated that "introductory or promotional rates universally applied at a given time but subsequently discontinued would not be prohibited." 8 F.C.C.R. at 5897. The special pricing plans at issue herein were not universally applied. Only existing CAS customers or customers threatening to defect to CAS were offered the plans. The plans were also not limited in time. Charter offered to continue to meet or beat CAS prices indefinitely to anyone who inquired about what happened at the end of the plan term. The only significant change apparent from the record to the special pricing plans is that Charter began providing $200 billing credits as opposed to $200 checks. The CAS-related special pricing plans are not promotional but are simply rate discrimination.

■ To the extent that a cable operator seeks to avoid the rate discrimination prohibition set forth in 47 U.S.C. § 543(e), there must be a rational basis for classifying or categorizing certain customers of cable systems from other customers. Thus, we now hold the non-discrimination provisions contained in 47 U.S.C. § 543(e) (1996) require a rational basis for the classification or categorization of cable customers where such classifications result in different treatment with respect to rates and/or services provided. This rational basis requirement is analogous to that imposed by the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and the equal protection guarantee inherent in the Due Process Clause of Art. III, Sec. 10 of the West Virginia Constitution for a rational ba-

---

**25.** Neither the PSC nor the parties raise the issue of where the FCC derived its authority to expand the two express exceptions set forth in 47 U.S.C. § 543(f) (1992).

**26.** The record amply demonstrates that the special pricing plans offered to CAS customers, former Charter customers who became CAS customers, and Charter customers who threatened to become CAS customers were not available to other customers or potential customers. Based upon the testimony in the record, they also do

not appear to have been temporary in nature. We note that the marketing of such plans was often done by door-to-door salespeople, a manner of marketing which is targeted and does not have a high potential for other similarly situated customers to learn or demand similar lower rates. We also take note that although the rates for a relatively few customers were low, the rates for most of Charter's customers, perhaps more than 10,000 customers, rose significantly during this time period.

sis to justify the disparate treatment of identifiable classes of citizens.

Therefore, with respect to Charter's CAS-related special pricing plans in the Wood County franchise area, we find that the PSC's orders of February 10, 2004, and March 23, 2004, were arbitrary and were contrary to the evidence of record, and that such orders misapplied the law applicable to the issues in this case. Accordingly, since the PSC did not properly determine that there was a rational basis for the "customer categories" to which Charter offers its "reduced or promotional rates," this case is reversed and remanded to the PSC to make that determination.

### E. The Duty to Notify the PSC of Rate Changes

■ W. Va.Code § 24D–1–23(b) (1999) provides that the PSC "may adopt rules and regulations as are necessary to implement the provisions of this article [the West Virginia Cable Television Systems Act]." The PSC promulgated emergency legislative rules to implement the provisions of the article, captioned "Rules and Regulations for the Government of Cable Television." Becoming effective on February 24, 2000, these Rules are set forth in 150 C.S.R. § 26. The Rules are extensive and relate in large measure to the issuance and renewal of cable system franchises, forms and instructions. Two provisions of the Rules relating to rates are relevant to this appeal and should be noted:

9.1 Cable operators are required by W. Va.Code § 24D–1–1 et seq. to provide all subscribers with sufficient advance written notice of any retiering of channels or increase of rates for service so that subscribers have the opportunity to discontinue service prior to the imposition of the notified rate increase or retiering. A Cable operator shall provide the subscriber advance written notice at least thirty (30) days before any rate increase or retiering takes effect, and shall provide a copy of the notice contemporaneously to the Commission

9.2. Cable operators shall notify the Commission of any change in cable service rates and submit the new schedule of rates

on the form prescribed by the Commission for that purpose at least sixty (60) days prior to the effective date of the rates.

150 C.S.R. 26 (Emphasis added.)

CAS contends that the PSC erred in ruling that Charter was not required to file the rates with the PSCfor its CAS-related special pricing plans which reflect changes in its otherwise filed rates as required by 150 C.S.R. § 26–9.2. In its tenth Conclusion of Law, the PSC concluded that the sixty day advance notice of any rate changes set forth in *Cable Rule* 9.2 does not apply to discounts or promotional rates such as those it contends are described in this case. According to the PSC, advance notice in accordance with *Cable Rule* 9.2 is only required when there is any change to standard non-promotional rates.

This Court is of the opinion that *Cable Rules* 9.1 and 9.2, when read together, support the PSC's interpretation of its own rules. The sixty day period is clearly designed to protect cable system customers from rate changes which may work to their personal disadvantage so as to permit such customers to change or cancel coverage. We are persuaded by the PSC's argument that the addition of a sixty day period before a customer could benefit from a favorable discount or promotional rate change would not only be detrimental to the customer, but would also give a sixty day notice of a cable operator's business decision to its competitors, thereby possibly discouraging cable operators from making such changes.

■ We hold that the sixty-day advance notice to the Public Service Commission of any cable service rate changes as required by the Commission's *Cable Rule* 9.2 does not apply to discounts or promotional rates. We decline to reverse the PSC on its tenth conclusion of law. However, being neither temporary in nature nor universally applied herein, we conclude that the specific special pricing plans at issue herein do not fall within the discount or promotional rate exception to the 60 day advance notice requirement.

## IV.

### CONCLUSION

For the reasons stated above, the February 10, 2004, and March 23, 2004, orders of the PSC are reversed, and the case is remanded to the PSC for further proceedings consistent with this opinion.

**Reversed and Remanded**