712 S.E.2d 504

**COMMUNITY ANTENNA SERVICE, INC. Plaintiff Below, Appellee**

v.

**CHARTER COMMUNICATIONS VI, LLC Defendant Below, Appellant.**

No. 35703.

Supreme Court of Appeals of West Virginia.

Submitted April 27, 2011.

Decided June 23, 2011.

596

Robert W. Full, Esq., Goodwin & Goodwin, LLP, Parkersburg, WV, for Community Antenna.

Bryant J. Spann, Esq., Allen Guthrie & Thomas, PLLC, Charleston, WV, Robert G. Scott, Jr., Esq., Davis Wright Tremaine LLP, Washington, District of Columbia, for Charter Communications.

KETCHUM, Justice:

This case has a simple central issue: did one television cable company offer discounted rates to some (but not all) of its customers in violation of a state law that prohibits "unduly discriminatory rates"?

The parties—two cable companies—have litigated this issue for over a decade. After a trial, a jury concluded that one cable company's reduced rates for only a few of its customers violated state law, and were designed to unfairly drive the smaller and economically weaker cable company out of business. The jury awarded the smaller cable company compensatory and punitive damages.

In this appeal from the Circuit Court of Wood County—the third time these parties have appeared before this Court—we find there is a private cause of action under the West Virginia Cable Television Systems Act against cable operators that illegally offer "unduly discriminatory" cable rates. We further find that the jury's award of compensatory and punitive damages was supported by the evidence.

## I.

### Facts and Background

Appellant Charter Communications VI, PLLC ("Charter"), acquired an existing television cable company in 1999, and began providing cable services to citizens in the more "urban" incorporated areas of Wood County, largely centered in Parkersburg, West Virginia. Appellee Community Antenna Service, Inc. ("Community Antenna"), is a much smaller company that provided cable services in rural, unincorporated areas of Wood County. In 1999, Community Antenna received a franchise agreement with the City of Parkersburg, and began extending its service into areas already served by the Charter system.

This appeal has its genesis in a lawsuit filed in the circuit court in October 2000. Appellant Charter brought a lawsuit alleging that Community Antenna had unlawfully entered into agreements with certain apartment building owners, whereby Community Antenna would be the exclusive cable provider for tenants in those buildings. Upon a certified question from the circuit court, we concluded that state law does not allow the kinds of exclusive contracts that Community Antenna made with apartment owners.[1]

At issue in this appeal is a counterclaim filed by Community Antenna in the underlying lawsuit. Community Antenna alleged that Charter was using an unlawful pricing

---

**1.** See Charter Communications VI, PLLC v. Community Antenna Service, Inc., 211 W.Va. 71, 561 S.E.2d 793 (2002).

scheme called "CAS buy-back plans" to unfairly drive Community Antenna out of business. A buy-back pricing plan was only offered by Charter to (1) Community Antenna customers, and (2) Charter customers who indicated an intent to leave Charter to subscribe to Community Antenna. The buy-back pricing plan was only offered in service areas where Charter and Community Antenna competed. No other Charter customer was eligible.

Under the buy-back pricing plans, Charter essentially offered some of its customers rates that would "meet or beat" Community Antenna's rates, and which were lower than Charter's rates for its customers who were not offered the buy-back pricing. If a Charter customer qualified for and received services under the plan—and about 800 did—the customer got some variation of cash rebates, credits, and/or reduced rates while simultaneously receiving added cable services. Charter customers usually received the benefit of the plan for a twelve-month period; however, some were allowed to extend their service under the plan, at reduced rates, indefinitely. The large number of Charter customers who were not in the service areas where Charter competed with Community Antenna were not offered the buy-back pricing plan.

During the pendency of the circuit court action, Community Antenna filed a complaint with the Public Service Commission. Community Antenna asked the Commission to find that Charter's buy-back pricing plans were "unduly discriminatory" in violation of the Cable Television Systems Act, *W.Va. Code*, 24D–1–13(b) [1999]. In 2002, an administrative law judge determined that Charter's buy-back plans "unduly discriminate in favor of certain customers [since] [o]nly customers who have [Community Antenna] service available and either leave Charter or threaten to leave Charter for [Community Antenna] are offered the plans." However, the Public Service Commission rejected the administrative law judge's recommended decision, and in 2004 decided that the buy-back

pricing plans were "reasonable and not discriminatory."

Community Antenna appealed the Commission's decision to this Court. In 2006, in a careful and extended discussion by Justice Benjamin of federal and state laws pertaining to the regulation of the cable television industry, we concluded that the Public Service Commission had erred.[2] We determined that Charter had a statutory responsibility to offer a uniform rate structure to its customers in the Wood County geographic area. By offering special pricing plans to only a few of its customers, Charter could be considered to have offered "unduly discriminatory" rates. The case was remanded to the Commission for further proceedings.

While the Public Service Commission's decision was under review by this Court, Charter sold its West Virginia cable systems to another provider. On remand, the Commission found that the case was moot because Charter no longer provided cable service in West Virginia, and because neither Charter nor its successor offered a pricing plan similar to those at issue after 2002. The Commission did, however, order that Charter and its successors "not offer the pricing plans which are at issue in this proceeding."

After this Court's decision in 2006, the parties began vigorously litigating Community Antenna's counterclaim against Charter which, again, alleged that Charter had, in violation of state and federal law, engaged in rate discrimination which was calculated to harm Community Antenna's business. After nine days of trial, on February 28, 2008, a jury concluded that Charter's buy-back plans constituted "unduly discriminatory rates" in violation of state law, and concluded that Charter had tortiously interfered with Community Antenna's business relationships with its customers. The jury awarded Community Antenna damages of $1,150,954 for discrimination; $1,446,350 for tortious interference; and $1,500,000 in punitive damages.

Charter filed various post-trial motions challenging the jury's verdict. In an order dated January 5, 2010, the circuit court de-

---

2. *See Community Antenna Service, Inc. v. Public Service Com'n of West Virginia*, 219 W.Va. 425, 633 S.E.2d 779 (2006).

nied Charter's motions and upheld the jury's verdict.

Charter now appeals the circuit court's January 5, 2010 order.

## II.

### Standard of Review

■ Charter challenges the circuit court's interpretation of the Cable Television Systems Act. "Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review." [3]

■ Charter also challenges the jury's award of punitive damages, and again, our review is *de novo*.[4] The standard of review of an order denying a motion for judgment as a matter of law after trial, pursuant to Rule 50(b), is also *de novo*.[5]

■ To the extent that Charter challenges the jury's factual findings, we accord the jury's determinations great deference. As we have stated:

In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable infer-

ences which reasonably may be drawn from the facts proved.[6]

We now turn to Charter's arguments.

## III.

### Discussion

Charter argues that the circuit court erred in not setting aside the jury's verdict, and offers three reasons in support. First, Charter argues that the circuit court incorrectly interpreted the Cable Television Systems Act, and thereby improperly created a private cause of action for damages to challenge cable television rates. Second, Charter argues that even if a private cause of action exists, Community Antenna failed offer direct evidence that Charter's conduct was the proximate cause of any harm to Community Antenna. Finally, Charter contends there was insufficient evidence to support the award of damages for tortious interference and punitive damages.

We consider each of these arguments in turn.

### A.

### Cause of Action under the Television Systems Act

The West Virginia Cable Television Systems Act [7] requires that rates for cable service be "just and reasonable" and not be "unduly discriminatory." The purpose of the Act is, in part, "to establish just, reasonable and nondiscriminatory rates and charges for the provision of cable service[.]" [8] Section 13 of the Act (*W.Va.Code*, 24D–1–13) charges the Public Service Commission with ensuring that cable operators [9] charge rates which are

---

3. Syllabus Point 1, *Appalachian Power Co. v. State Tax Dept. of West Virginia*, 195 W.Va. 573, 466 S.E.2d 424 (1995).

4. Syllabus Point 16, *Peters v. Rivers Edge Min., Inc.*, 224 W.Va. 160, 680 S.E.2d 791 (2009) ("When reviewing an award of punitive damages ... this Court will review *de novo* the jury's award of punitive damages and the circuit court's ruling approving, rejecting, or reducing such award.")

5. Syllabus Point 1, *Fredeking v. Tyler*, 224 W.Va. 1, 680 S.E.2d 16 (2009) ("The appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the *West*

*Virginia Rules of Civil Procedure* [1998] is *de novo*.").

6. Syllabus Point 5, *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983).

7. *W.Va.Code*, 24D–1–1 to –27.

8. *W.Va.Code*, 24D–1–1 [1999].

9. " 'Cable operator' means any person or group of persons (A) who provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in the cable system or (B) who otherwise controls or is responsible for, through any arrangement, the management and operation of a cable system." *W.Va.Code*, 24D–1–2(5) [1999].

just and reasonable, and not unduly discriminatory and says, in pertinent part:

(b) ... [T]he commission shall regulate rates to ensure that they are just and reasonable both to the public and to the cable operator and are not unduly discriminatory.

(c) ... [T]he commission shall regulate charges other than those related to rates for the provision of basic cable service to ensure that they are just and reasonable and not unduly discriminatory.[10]

Charter's first argument is that only the Public Service Commission may determine if rates are unduly discriminatory. Charter argues that the circuit court erred in "creating" a private cause of action under the Cable Television Systems Act. Charter asserts—relying upon an array of cases interpreting *federal* law which hold that there is no cause of action for discriminatory cable rates under *federal* law—that there is, accordingly, no cause of action under *state* law.[11]

Community Antenna, however, contends that the Cable Television Systems Act, taken as a whole, gives citizens and cable operators a private right to enforce Section 13, in addition to the Public Service Commission's authority.

First, the Cable Television Systems Act gives both the Public Service Commission and any "other aggrieved party" the right to institute an action for any "relief to compel compliance" with the Act, or to restrain, prevent or prohibit "any illegal or unauthorized conduct" under the Act. Specifically, *W.Va. Code*, 24D–1–23(e) says:

The commission or other aggrieved party may institute, or intervene as a party in, any action in any court of law seeking a mandamus, or injunctive or other relief to compel compliance with this chapter, or any rule, regulation, or order adopted hereunder, or to restrain or otherwise prevent or prohibit any illegal or unauthorized conduct in connection with this article.[12]

Second, *W.Va.Code*, 24–D–1–22(c) of the Cable Television Systems Act gives a "complainant" who has concerns "regarding the operation of a cable system" all of the "rights ... set forth" in Chapter 24 of the *West Virginia Code*.[13]

Chapter 24 of the *Code* creates the Public Service Commission, specifies the Commission's powers to regulate utilities,[14] and imposes various duties upon public utilities. Those duties include the duty not to discriminate in the prices charged to customers by charging "greater or less compensation ... under the same or substantially similar circumstances and conditions," or giving "undue or unreasonable preference or advantage" to some customers over others.[15] Chapter 24 goes on to create procedures for the Commission to enforce violations of these statutory duties.

(a) Complaints of affected parties regarding the operation of a cable system must be made in writing and filed with the commission....

(c) In the event that the commission cannot resolve the complaint to the satisfaction of all parties, the complainant may file a formal request to the commission and the complainant and cable operator shall be afforded all rights including the right of appeal as set forth in chapter twenty-four of this code.

---

**10.** *W.Va.Code*, 24D–1–13(b), (c) [1999].

**11.** The cases cited by Charter relate to interpretations of the Federal Cable Act, 47 U.S.C. § 543. *See, e.g., Mallenbaum v. Adelphia Communications Corp.*, 1994 WL 724981 (E.D.Pa.1994); *Commonwealth of Pennsylvania v. Comcast Corp.*, 1994 WL 568479 (E.D.Pa.1994); *Kentucky ex rel. Gorman v. Comcast Cable of Paducah, Inc.*, 881 F.Supp. 285 (W.D.Ky.1995); *Aventura Cable Corp. v. Rifkin/Narragansett South Florida CATV Ltd. Partnership*, 941 F.Supp. 1189 (S.D.Fla. 1996). *See also, Broder v. Cablevision Systems Corp.*, 329 F.Supp.2d 551, 558 n. 6 (S.D.N.Y. 2004) ("The courts have uniformly ruled that [47 U.S.C.] § 543(d) does not create an implied private right of action.").

**12.** *W.Va.Code*, 24D–1–23(e) [1999].

**13.** *W.Va.Code*, 24D–1–22(a) and (c) [1999] state, in part:

**14.** *W.Va.Code*, 24–1–1 [1986] empowers the Commission to "[e]nsure that rates and charges for utility services are just, reasonable, applied without unjust discrimination or preference ... and based primarily on the costs of providing these services[.]" However, the Cable Television Systems Act says that, "No provision of this article may be construed to grant the commission the power to regulate the cable television industry as a utility." *W.Va.Code*, 24D–1–26 [1999].

**15.** *W.Va.Code*, 24–3–2 [1983].

In addition, Chapter 24 permits any "person, firm or corporation," damaged by a public utility's violation of the duties created by Chapter 24, to bring a suit for the recovery of the damages in any circuit court. Specifically, *W.Va.Code*, 24-4-7 says:

Any person, firm or corporation claiming to be damaged by any violation of this chapter by any public utility subject to the provisions of this chapter, may make complaint to the commission, as provided herein, and bring suit in his own behalf for the recovery of the damages for which such public utility may be liable under this chapter in any circuit court having jurisdiction.[16]

This right to a private cause of action against public utilities has existed since Chapter 24 was first adopted by the Legislature in 1913.

Community Antenna asserts that by reading *W.Va.Code*, 24D-1-22(c), -23(e), and *W.Va.Code*, 24-4-7 together, it is clear that the Legislature intended for any person, firm or corporation damaged by a violation of the Cable Television Systems Act to be permitted to institute a private suit for damages caused by the violation. After examining the precise words chose by the Legislature in adopting these statutes, we agree.

 "The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature."[17] "A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect."[18]

 Our rules of statutory construction require us to give meaning to all provisions in a statutory scheme, if at all possible.[19] We must apply statutes so that no legislative enactment is meaningless, and to read them to harmonize with legislative intent.[20] "Statutes which relate to the same subject matter should be read and applied together so that the Legislature's intention can be gathered from the whole of the enactments."[21] "It is always presumed that the legislature will not enact a meaningless or useless statute."[22]

 Furthermore, statutes are not to be construed in a vacuum, but must be read in the context of the general system of law of which the Legislature intended it to be a part:

A statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it is intended to form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose

---

16. *W.Va.Code*, 24-4-7 [1913].

17. Syllabus Point 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975).

18. Syllabus Point 2, *State v. Epperly*, 135 W.Va. 877, 65 S.E.2d 488 (1951). *In accord*, Syllabus Point 5, *State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars*, 144 W.Va. 137, 107 S.E.2d 353 (1959) ("When a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute."); Syllabus Point 2, *Crockett v. Andrews*, 153 W.Va. 714, 172 S.E.2d 384 (1970) ("Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation.").

19. *See* Syllabus Point 2, *Smith v. State Workmen's Compensation Com'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975) ("In ascertaining legislative intent,

effect must be given to each part of the statute and to the statute as a whole so as to accomplish the general purpose of the legislation.").

20. Syllabus Point 1, *State ex rel. Holbert v. Robinson*, 134 W.Va. 524, 59 S.E.2d 884 (1950) ("A statute is enacted as a whole with a general purpose and intent, and each part should be considered in connection with every other part to produce a harmonious whole. Words and clauses should be given a meaning which harmonizes with the subject matter and the general purpose of the statute. The general intention is the key to the whole and the interpretation of the whole controls the interpretation of its parts.").

21. Syllabus Point 3, *Smith v. State Workmen's Compensation Com'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975).

22. Syllabus Point 4, *State ex rel. Hardesty v. Aracoma-Chief Logan No. 4523, Veterans of Foreign Wars*, 147 W.Va. 645, 129 S.E.2d 921 (1963).

and design thereof, if its terms are consistent therewith.[23]

In other words, statutes must be read in *pari materia* to ensure that legislative intent is being effected. "Statutes which relate to the same persons or things, or to the same class of persons or things, or statutes which have a common purpose will be regarded in *pari materia* to assure recognition and implementation of the legislative intent. Accordingly, a court should not limit its consideration to any single part, provision, section, sentence, phrase or word, but rather review the act or statute in its entirety to ascertain legislative intent properly." [24]

█ We have reviewed the Cable Television Systems Act in its entirety, as well as considered its place in the overall scheme of regulation by the Public Service Commission, and we conclude that the Legislature plainly intended to create a private cause of action for violations of the Act. We therefore hold that under the Cable Television Systems Act, any person, firm or corporation damaged by a violation of the Act by any cable operator may bring suit for the recovery of the damages for which such cable operator may be liable.

Accordingly, we find that the circuit court properly allowed Community Antenna to proceed to trial with its allegations that it had suffered damages because Charter had, in violation of the Act, charged rates that were unduly discriminatory and were neither just nor reasonable.

## B.

### A Rational Basis for Cable Rates and Direct Evidence

Charter's second argument is an attack on the quality of the evidence introduced by Community Antenna in support of its case. Charter argues that there was an obvious rational basis for its various special pricing plans, and argues that Community Antenna failed to prove otherwise. Charter argues that the circuit court, as a matter of law, should have given deference to Charter's pricing decisions and determined there was a rational basis for its differing treatment of its own customers. Additionally, Charter argues that Community Antenna failed to show that the special pricing plans were the sole motivating cause for the customer choosing to sign a contract with Charter rather than Community Antenna.

In our 2006 decision in *Community Antenna v. Public Service Commission*,[25] we indicated that Charter's buy-back pricing plans were "simply rate discrimination" under the Cable Television Service Act.[26] We found that the "record clearly demonstrates that a very few customers benefitted from Charter's targeting of [Community Antenna] customers and potential customers and the vast majority of Charter customers were forced to pay much higher rates for the same services." [27] We concluded that Charter's claim that its pricing plans were not unduly discriminatory was "legally unsupported" because the plans "were not universally applied." [28]

█ Justice Benjamin, writing for the Court in *Community Antenna*, crafted a test to measure whether a cable operators's pricing plan was reasonable and not unduly discriminatory: "there must be a rational basis for classifying or categorizing certain customers of cable systems from other customers." [29] As the opinion states in Syllabus Point 4:

**23.** Syllabus Point 5, *State v. Snyder*, 64 W.Va. 659, 63 S.E. 385 (1908).

**24.** Syllabus Point 5, *Fruehauf Corp. v. Huntington Moving & Storage Co.*, 159 W.Va. 14, 217 S.E.2d 907 (1975). *See also*, Syllabus Point 3, *State ex rel. Graney v. Sims*, 144 W.Va. 72, 105 S.E.2d 886 (1958) ("Statutes in pari materia must be construed together and the legislative intention, as gathered from the whole of the enactments, must be given effect.").

**25.** *Community Antenna Service, Inc. v. Public Service Commission of West Virginia*, 219 W.Va. 425, 633 S.E.2d 779 (2006).

**26.** 219 W.Va. at 440, 633 S.E.2d at 794.

**27.** 219 W.Va. at 436 n. 21, 633 S.E.2d at 790 n. 21.

**28.** 219 W.Va. at 440, 633 S.E.2d at 794.

**29.** *Id.*

The non-discrimination provisions contained in 47 U.S.C. § 543(e) (1996) require a rational basis for the classification or categorization of cable customers where such classifications result in different treatment with respect to rates and/or services provided.

We found in *Community Antenna* that the Public Service Commission had erred in its assessment of whether Charter had committed any undue discrimination, and remanded the case so that the Commission could determine if "there was a rational basis for the 'customer categories' to which Charter offers its 'reduced or promotional rates[.]' " [30]

Charter asserts that the circuit court erred in its interpretation of *Community Antenna*'s rational basis test. Charter argues that the phrase "rational basis" in *Community Antenna* has a meaning co-equal with the rational basis test in constitutional equal protection cases—namely that it "describes [a] minimal level of scrutiny" [31] or "the least level of scrutiny" [32] that is highly deferential to government actors. Charter asserts that the circuit court should have been deferential to its business decisions regarding pricing, and should have found a rational basis existed as a matter of law "rather than simply holding that the evidence allowed the jury to find no rational basis."

▪ We reject Charter's interpretation of the phrase "rational basis." In *Community Antenna*, we stated that "in order for separate categories of customers to be 'reasonable,' there must be a rational basis for establishing the categories." [33] We recognized that "the phrase 'rational basis' is also associated with prohibited state imposed discrimination and violations of the principles of equal protection." [34] However, we made it

clear that while the line of cases involving constitutional questions "is instructive" [35] and "analogous," [36] it "is not dispositive[.]" [37]

▪ In a world of limited resources, and with respect to separation of powers, courts accord deference to legislative and executive branch actors in constitutional, equal protection cases. We have therefore allowed these governmental actors to create a classification if it bears a "reasonable relationship to a proper governmental purpose." [38] But such deference is not afforded to a private, non-governmental entity. We indicated in *Community Antenna* that a non-governmental entity "may classify its patrons" and charge each class different rates only so long as it shows that the rates do not "give an undue or unreasonable preference or advantage to or make an unfair discrimination among its patrons and consumers under the same or substantially similar circumstances and conditions." [39]

▪ We concluded in *Community Antenna* that Charter failed to "offer a rationale . . . that former Charter customers who became [Community Antenna] customers or who threatened to do so formed a reasonable category to whom discriminatory rates could be charged." [40] Special pricing, to have a rational basis under the Cable Television Systems Act, must be based upon justifiable differences in the economic benefits the cable operator derives from servicing categories of customers to whom special pricing is offered. Based upon the record, we cannot say that the circuit court erred in submitting a similar question to the jury.

Charter also argues that Community Antenna failed to establish that the buy-back

---

**30.** 219 W.Va. at 441, 633 S.E.2d at 795.

**31.** *Dolan v. City of Tigard*, 512 U.S. 374, 391, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994).

**32.** *Lewis v. Canaan Valley Resorts, Inc.*, 185 W.Va. 684, 691, 408 S.E.2d 634, 641 (1991).

**33.** *Community Antenna*, 219 W.Va. at 436, 633 S.E.2d at 790.

**34.** *Id.*

**35.** *Id.*

**36.** 219 W.Va. at 437, 633 S.E.2d at 791.

**37.** 219 W.Va. at 436, 633 S.E.2d at 790.

**38.** Syllabus Point 4, in part, *Gibson v. West Virginia Dept. of Highways*, 185 W.Va. 214, 406 S.E.2d 440 (1991).

**39.** 219 W.Va. at 437, 633 S.E.2d at 791.

**40.** 219 W.Va. at 440, 633 S.E.2d at 794.

pricing plans were the proximate cause of any damages to Community Antenna. Charter posits that if there are multiple possible causes for a plaintiff's alleged injury, only one of which is attributable to the defendant's actions, then a jury may not be permitted to find causation. Charter asserts that there is no direct evidence that any customer left Community Antenna "because of" Charter's challenged pricing plans. Although circumstantial evidence was introduced that Charter may have caused Community Antenna harm, Charter argues that the circuit court should not have permitted the jury to speculate as to why any *specific* customer, among the 800 claimed, made the change.

Community Antenna responds that federal law precluded both Community Antenna and Charter from providing specific information about the name, address, or any other identifying information of any customer who benefitted from Charter's buy-back pricing plans.[41] Hence, no specific customer's testimony was introduced at trial, and the reasons for each customer's decision could not be presented. Still, Community Antenna asserts that the numerous memos, work orders, and other documents introduced to the jury circumstantially proved that some customers switched service to Charter because of the pricing plans. Further, testimony by Charter employees indicates that the pricing plans were designed, and which worked, as an incentive to influence customers' decisions.

The essence of Charter's argument is that Community Antenna should not have been allowed to prove its case by circumstantial evidence, but should have been required to prove it by direct evidence. Such a position is in no way supported by the law.

 "Circumstantial evidence is information that tends directly to prove or disprove not a fact in issue but a fact or circumstance from which, either alone or in connection with other facts and circumstances, one may, according to the common experience of mankind, reasonably infer the existence or nonexistence of a fact that is in issue.... In West Virginia and in federal courts, civil and criminal verdicts may be based entirely upon circumstantial evidence."[42]

A plaintiff relying on circumstantial evidence to establish that a defendant's conduct caused a harm is not required to exclude every other possible cause. "There may be two or more plausible explanations as to how an event happened or what produced it ... [I]f there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence."[43]

 For example, in the context of product liability actions, we have said that a plaintiff is not required "to conclusively eliminate all possible contributing causes other than a defect for an accident. Instead, a plaintiff is only required to submit evidence that has the capacity to sway the outcome of the litigation, and from which a jury could fairly conclude that the most likely explanation of the accident involves the causal contribution of a product defect."[44]

The plaintiff is not required to eliminate with certainty all other possible causes of the accident. It is sufficient if the evidence reasonably eliminates other causes such as the handling or misuse of the product by others than the manufacturer, thus permitting the fact finder to find that it was more [probable] than not that the product was defective.[45]

Put another way,

The defect need not be the only cause of the incident; if the plaintiff can prove that

41. *See,* 47 U.S.C. § 551 [1992].

42. Franklin D. Cleckley, 1 *Handbook on Evidence for West Virginia Lawyers,* § 1–2(F)(2) [4th Ed.2000].

43. *Oates v. Continental Ins. Co.,* 137 W.Va. 501, 512, 72 S.E.2d 886, 892 (1952) (*quoting Southern Ry. Co. v. Dickson,* 211 Ala. 481, 100 So. 665, 669 (1924)).

44. *Bennett v. Asco Services, Inc.,* 218 W.Va. 41, 48, 621 S.E.2d 710, 717 (2005). *See also, Anderson v. Chrysler Corp.,* 184 W.Va. 641, 403 S.E.2d 189 (1991).

45. *Bennett v. Asco Services, Inc.,* 218 W.Va. 41, 48–49, 621 S.E.2d 710, 717–18 (2005) (*quoting* 2 Am.L.Prod.Liab.3d § 31:26).

the most likely explanation of the harm involves the causal contribution of a product defect, the fact that there may be other concurrent causes of the harm does not preclude liability[.] [46]

"A *prima facie* case is not overcome by evidence which merely affords a bare conjecture to the contrary." [47]

■■■ We hold that a plaintiff relying on circumstantial evidence to establish the cause of a harm is not required to eliminate all other possible causes of the harm. A plaintiff is only required to submit evidence from which the jury can conclude, by a preponderance of the evidence, that the defendant's conduct caused the harm. The fact that there may be other causes of the harm does not preclude liability.

■■■ Approximately 800 of Charter's customers benefitted from the special buy-back pricing plans. The records and testimony about those sales at trial constitutes strong circumstantial evidence from which the jury could have inferred—via a logical sequence of cause and effect—that the pricing plans were the reason customers switched to Charter from Community Antenna, or abandoned their intent to switch to Community Antenna. Community Antenna was not required to eliminate with certainty all other possible reasons why customers accepted Charter's buy-back pricing plan. We therefore believe that the jury could have properly concluded that the buy-back pricing plans were a proximate cause of Community Antenna's losses.

## C.

### Sufficiency of the Evidence of Damages

At trial, Community Antenna offered evidence and expert testimony indicating that, as a result of Charter's buy-back pricing plans, Community Antenna had suffered lost past profits, lost business opportunity profits, and lost future profits. The jury awarded damages of $1,150,954 for unduly discriminatory cable rates, and $1,446,350 for tortious interference.

■■■ Charter argues that the jury's verdict is not supported by the evidence. However, we have made clear that because a jury's

> verdict below is entitled to considerable deference, an appellate court should decline to disturb a trial court's award of damages on appeal as long as that award is supported by some competent, credible evidence going to all essential elements of the award.[48]

After carefully examining the evidence and testimony of compensatory damages offered by Community Antenna, we believe that the jury's verdict is well within the evidence presented. Accordingly, we decline to disturb the trial court's award of damages for unduly discriminatory cable rates and for tortious interference.

Charter also argues that the jury's award of $1,500,000 in punitive damages is unsupported by the evidence. Charter points to our statement in *Community Antenna* where we said that this case presents "a complex maze of interrelating applicable federal and state laws," [49] for which there was "no direct judicial precedent from this or any other jurisdictions." [50] Because of this legal complexity, Charter argues that, as a matter of law, its conduct could not have demonstrated a willful indifference or intent to violate legal standards. Charter also argues that the Public Service Commission never imposed penalties for this exact same pricing conduct.[51]

**46.** *Bennett*, 218 W.Va. at 49, 621 S.E.2d at 718 (*quoting Restatement (Third) of Torts: Products Liability*, § 3, cmt. c and d [1998]).

**47.** Syllabus, *Scioto Livestock Sales Co. v. Crockett*, 116 W.Va. 27, 178 S.E. 427 (1935).

**48.** Syllabus Point 4, in part, *Reed v. Wimmer*, 195 W.Va. 199, 465 S.E.2d 199 (1995).

**49.** *Community Antenna*, 219 W.Va. at 431, 633 S.E.2d at 785.

**50.** 219 W.Va. at 432 n. 14, 633 S.E.2d at 786 n. 14.

**51.** *See* Syllabus Point 4, *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991) ("When the trial court reviews an award of punitive damages, the court should, at a minimum, consider ... (2) Any criminal sanctions imposed on the defendant for his conduct[.]").

■ Community Antenna responds that there was sufficient evidence for the jury to find that Charter acted oppressively, maliciously, and/or wantonly in its continued use of unduly discriminatory cable rates to tortiously interfere with Community Antenna's business expectations. The jury viewed Charter's internal communications showing Charter had more than an intent to compete fairly and developed the pricing scheme out of ill will to "crush" or "devastate" Community Antenna. Community Antenna argues that the laws prohibiting undue discrimination were first enacted in 1990, and yet Charter began its buy-back pricing plans in 1999. Further, Charter continued to use the buy-back pricing plans until 2003—that is, after Community Antenna filed the instant counterclaim in late 2000, after Community Antenna filed a complaint with the Public Service Commission in May 2001, and after an administrative law judge concluded such plans were unduly discriminatory in August 2002. Community Antenna also introduced evidence that Charter concealed its pricing scheme from its other, similarly-situated customers.

■ "Our punitive damage jurisprudence includes a two-step paradigm: first, a determination of whether the conduct of an actor toward another person entitles that person to a punitive damage award under *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895); second, if a punitive damage award is justified, then a review is mandated to determine if *the* punitive damage award is excessive under *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991)." [52]

On the first step, we must consider whether Charter's actions constitute "gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others" so as to support an award of punitive damages.[53] We believe that the jury in the instant case assessed Charter's conduct, and properly found the conduct was sufficiently

grievous to warrant an award of punitive damages.

■ In the second step, we must consider whether there was any meaningful constraint upon the jury's discretion in awarding punitive damages, and whether there was any meaningful and adequate review of the jury's verdict by the circuit court, as required by *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991). We give each punitive damage verdict a careful review if a party asks, but a petition seeking review "must address each and every factor set forth in Syllabus Points 3 and 4 of [*Garnes*] with particularity, summarizing the evidence presented to the jury on the subject or to the trial court at the post-judgment review stage. Assignments of error related to a factor not specifically addressed in the petition will be deemed waived as a matter of state law." [54]

■ In the instant case, Community Antenna points out that Charter has largely waived its *Garnes* arguments, because it has failed to specifically address each and every factor of the *Garnes* analysis, and has not summarized much of the evidence presented to the jury and the trial court. While we agree, we have still reviewed the record and find that the jury was properly instructed on the factors contained in Syllabus Point 3 of *Garnes*. The jury's verdict bears a reasonable relationship to the jury's compensatory damage determination, and is in accord with the harm that is likely to be caused to one cable company by another's unjust, unfair and discriminatory pricing. We have carefully reviewed the record in light of the factors in *Garnes*, and we find that the jury's punitive damage award is supported by the record. The circuit court committed no error by refusing to set aside or reduce that verdict.

### IV.

#### *Conclusion*

The circuit court's January 5, 2010 order is affirmed.

Affirmed.

---

**52.** Syllabus Point 7, *Alkire v. First Nat. Bank of Parsons*, 197 W.Va. 122, 475 S.E.2d 122 (1996).

**53.** *See* Syllabus Point 4, in part, *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895).

**54.** Syllabus Point 5, *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991).

Justice McHUGH, deeming himself disqualified, did not participate.

Judge GAUJOT, sitting by temporary assignment.