BENJAMIN, Justice:
The West Virginia State Treasurer, John D. Perdue, appeals the order entered by the Circuit Court of Putnam County on December 27, 2013, that dismissed with prejudice sixty-three complaints he filed separately against insurance companies doing business in West Virginia. The complaints alleged, inter alia, that the insurers have unlawfully retained life insurance proceeds unclaimed by State residents, in contravention of the *4 West Virginia Uniform Unclaimed Property-Act of 1997, W. Va.Code §§ 36-8-1 to -32 (the “Act”). The Act, according to the Treasurer, manifestly designates him the legal custodian of such proceeds. The circuit court adopted the contrary view that the insurers’ obligations under the Act are defined not by its clear and unequivocal provisions, but instead by the contractual terms of the life insurance policies taken out by the insureds. Because the circuit court’s interpretation failed to give force and effect to the plain meaning of the words used in the Act, thereby frustrating clear legislative intent, we reverse the dismissal order and remand these matters for further proceedings. •
I. FACTUAL AND PROCEDURAL BACKGROUND
- The Act designates the Treasurer as[1] -its administrator.. See W. Va.Code § 36-8-1(1) (1997). In his role as administrator, the Treasurer is entitled to take custody of property presumed to have been abandoned if, inter alia, the apparent owner’s last known address is in West Virginia. See id: §§ 36-8-4, -4(1). An “apparent owner” under the Act is “a person whose name appears on the records of a holder as the person entitled to property held, issued or owing by the holder.” Id. § 36-8-1(2). A holder, in turn, is “a person obligated to hold for the account of, or deliver or pay to, the owner” any property subject to the Act. Id. § 36-8-1(6). The insurance companies do not dispute their status as holders for "purposes of this appeal.
Whether specific property may be. presumed abandoned is determined by resort to the Act. In the context of the dispute before us, section 2 of the Act provides:
(a) Property is presumed abandoned if it is unclaimed by the apparent owner during the time set forth below for the particular property:
(8) Amount owed by an insurer on a life or endowment insurance policy or an annuity that has matured or terminated, three years after the obligation to pay arose or, in the case of a policy or annuity payable upon proof of death, three years after the insured has attained, or would have attained if living, the limiting age under the mortality table on which the reserve is basedt.]
Id. § 36 — 8—2(a), -2(a)(8) (1997) . (emphasis added). ■ With respect to the foregoing provision, the Treasurer’s position is easily understood: an insurer’s obligation to pay the beneficiary of a;life insurance policy arises when the insured dies.[1].
. An insurer in possession of presumptively abandoned life insurance proceeds — like any holder of comparable property — must annually file a verified report with the Treasurer, which, inter alia, describes the property and provides the identity and last known address of the apparent owner. See W. Va.Code §§ 36-8-7 (1997). Within sixty to one hundred twenty days prior to filing the report, the insurer is required in most cases to attempt to notify the apparent owner in writing that he or she should claim the proceeds. See id. § 36-8-7(e). If the notification effort proves unsuccessful, the insurer shall (with certain exceptions not applicable' here) turn over the proceeds to the Treasurer, see id. § 36-8-8(a), who then deposits them in the Unclaiméd Property Fund, see id. § 36-8-13(b). '
Between September 20, 2012, and December 28, 2012, the .Treasurer filed sixty-nine substantially similar complaints in the circuit court against insurance companies, seeking to enforce the insurers’ obligations under the Act to file reports and transfer presumptively abandoned life insurance proceeds. In those complaints, the Treasurer pertinently alleged that the United States Department of Commerce maintains a computerized database, known as the Death Master File (“DMF”), compiled from -social security records.[2] Where the insurers have issued an *5 annuity contract payable only during the lifetime of the annuitant, the Treasurer asserts that the DMF is regularly consulted to determine whether the annuitant has died and the contractual obligation has ended. With respect to the life insurance policies they issue, however, the Treasurer contends that the insurers do not avail themselves of the DMF or of any alternative data source to determine whether the insured has died with no claim to the proceeds having yet been filed by a beneficiary. Moreover, the Treasurer alleges that, in certain cases where premiums on whole life products are no longer remitted (or due) because the policyholder has died, the insurers, in the absence of a claim, 'siphon to exhaustion the underlying cash value in satisfaction of the phantom premiums on the fiction that the policyholder is perhaps alive and would not want the policy to lapse.
According to the Treasurer, because the insurance companies have declined to use the DMF to learn of the deaths of their insureds, they have “failed to truthfully report abandoned or unclaimed property,” and have “paid into the Unclaimed Property Fund amounts less than actually due the State under the Act.” The complaints thus demand a statutory audit, see West Virginia Code § 36-8-20(b) (1997), interest and civil penalties on proceeds thereby discovered to have been improperly withheld, see id. §• 86-8-24, and injunctive relief compelling the insurers to implement policies and procedures to assist in facilitating their future compliance with the Act. The Treasurer also pursues an award of attorney fees. See id. § 36-8-22.
In sixty-three of the proceedings, the defendant insurance company moved for dismissal on the ground that, the complaint failed to state a claim upon which relief could be granted. See W. Va. R.'Civ. P. 12(b)(6). The circuit court conducted a hearing on the motions on September 6, 2013, and, on December 27, 2013, it entered an order granting them. In so ruling, the circuit court concluded that the Act should be construed in pari materia with the provisions of Article 13 of the Insurance Code, West Virginia Code §§' 33-13-1 to -48, and specifically Code section 33-13-14, which requires all life insurance policies delivered in the state'to include “a provision that when a policy shall become a claim by the death of the insuredt,] settlement shall be made upon receipt óf due proof of death.”’ .
The circuit court thus reasoned that, until proof of an insured’s death had been .submitted to the insurer, no “obligation- to pay” the proceeds of the insured’s life insurance policy could arise within the meaning of the Act. Consequently, the insurer should be permitted to retain those proceeds until someone having a contractually dérived interest makes a formal claim in accordance .with .the policy. On January 24, 2014,-the Treasurer timely noticed his appeal of the circuit court’s order.[3]
II. STANDARD OF REVIEW
We review de. novo the circuit court’s grant pf the respondents’motions to dismiss the complaints pursuant to: Rule 12(b)(6) of the West Virginia Rules of .Civil *6 Procedure. See syl. pt. 2, State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc., 194 W.Va. 770, 461 S.E.2d 516 (1995), In-conducting our review, we construe the complaints in the light most favorable to the non-moving party, meaning that we accept as true the well-pleaded factual allegations therein and draw all reasonable inferences therefrom to the Treasurer’s advantage. See Conrad v. ARA Szabo, 198 W.Va. 362, 369-70, 480 S.E.2d 801, 808-09 (1996) (citing Murphy v. Smallridge, 196 W.Va. 35, 36, 468 S.E.2d 167, 168 (1996)). We are not bound, however, to accept any party’s posited statutory interpretations or proffered conclusions of law. See W. Va. Human Rights Comm’n v. Garretson, 196 W.Va. 118, 123, 468 S.E.2d 733, 738 (1996). A complaint should not be deemed insufficient under Rule 12(b)(6) and thereby dismissed “unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.” Syl. pt. 3, Chapman v. Kane Transfer, Inc., 160 W.Va. 530, 236 S.E.2d 207 (1977) (citation omitted).
III. ANALYSIS
As a threshold matter, courts may not regard separate and distinct statutes in pari materia unless' the Legislature’s intent is ambiguous with respect to the statute in question. See State ex rel. Morrisey v. W. Va. Office of Disciplinary Counsel, 234 W.Va. 238, 764 S.E.2d 769, 780 (2014) (“ ‘[T]he rule that statutes which relate to the same subject should be read and construed together is a rule of statutory construction and does not apply to a statutory provision which is clear and unambiguous.’” (quoting syl. pt. 1, State v. Epperly, 135 W.Va. 877, 65 S.E.2d 488 (1951))). Here, the circuit court believed the Act to be ambiguous, thereby permitting it to look to Article 13 of the Insurance Code to discern the Legislature’s intent in enacting the former. See syl. pt. 6, Cmty. Antenna Serv., Inc. v. Charter Comm’ns VI, LLC, 227 W.Va. 595, 712 S.E.2d 504 (2011) (instructing that separate and distinct statutes “ ‘relating] to the same persons or things, or to the same class of persons or things, or statutes which have a common purpose will be regarded in pari materia to assure recognition and implementation of the legislative intent’ ” (quoting syl. pt. 5, Fruehauf Corp. v. Huntington Moving & Storage Co., 159 W.Va. 14, 217 S.E.2d 907 (1975))). With respect to the insurers’ duties herein, the circuit court’s construction of the Act in pari materia with the Insurance Code was appropriate only if the Act’s relevant provisions are ambiguous. If, however, the Act’s relevant provisions are not ambiguous, the circuit court’s resort to the Insurance Code was unnecessary and improper.
To ensure that we interpret the Act to accurately ascertain the insurers’ duties in accordance with what the Legislature intended, we rely primarily on a crucial component of section 2 — subsection (e) — that precisely sets forth the parameters of property presumed abandoned, confirming that such “[pjroperty is payable or distributable ... notwithstanding the owner’s failure to make demand or present an instrument or document otherwise required to obtain payment.” W. Va.Code § 36-8-2(e) (1997) (emphasis added). Section 2(e) is best understood as acknowledging and codifying the United States Supreme Court’s decision in Connecticut Mutual Life Insurance Co. v. Moore, 333 U.S. 541, 68 S.Ct. 682, 92 L.Ed. 863 (1948). At issue in •Moore was New York’s Abandoned Property Law, which, inter alia, required insurers to report and pay over to the state the proceeds of life insurance, policies on which no claim had been made -within seven years following the death of the insured. The Supreme Court rejected constitutional challenges by a group of insurers that the required transfer to the state’s abandoned property fund impaired their right to rely upon bargained-for claims procedures set forth in their policies. The insurers argued that they had no obligation to pay anyone unless a proper claim was made, and that due process required the state to instead seek judicial authorization prior to any transfer of proceeds to the New York fund. In ruling against the insurers, the Supreme Court observed that the state, in taking custody of abandoned property, “is acting as a conservator, not as a party to a contract.” Id. at 547, 68 S.Ct. 682. Thus, the Supreme Court reasoned, “it would be beyond á reasonable requirement to compel the state to comply with conditions that may be quite *7 proper as between the contracting parties.” Id..
Our reading of section 2(e)’s provenance in Moore is consistent with-that of the drafters of the model Uniform Unclaimed Property Act. In the official commentary to section 2(e) published in connection with the model statute’s 1995 iteration, which was subsequently enacted in West Virginia, the drafters explained that
Subsection (e) [of section 2] is intended to make clear that property is reportable notwithstanding that the. owner, who has lost or otherwise forgotten his or her entitlement to property, fails to present to the holder evidence of ownership or to make a demand for payment. See Connecticut Mutual Life Insurance Co. v. Moore, 333 U.S. 541 [68 S.Ct. 682, 92 L.Ed. 863] (1948).
National Conference of Commissioners on Uniform State Laws, Uniform Unclaimed Property Act, § 2 cmt. (1995). By this 1995 iteration, Moore’s general application to the law of unclaimed property had already been firmly established for at least fourteen years, that is, from the immediately preceding 1981 version of the model statute. The 1995 version of section 2(e) and its attendant commentary regarding Moore were reproduced almost verbatim from the 1981 version. It is apparent that West Virginia’s Legislature was fully aware of section 2(e)’s genesis in the Moore decision. Moreover, we note that the first inclusion of section 2(e) in the model uniform statute in 1981 came just one year after DMF records béeame publicly available.
The insurers would have us limit Moore to its facts. Indeed, insofar as the Supreme Court’s review was confined solely to the constitutional validity of the New York statute-, the circuit court expressed doubt that the principles set forth in Moore apply with equal force to matters of statutory construction decided exclusively pursuant to state law. We harbor no similar doubt and conclude that Moore bears squarely on the state law question we decide today. Moore applies necessarily through section 2(e) to any sort of property that might be presumed abandoned, including beyond doiibt the life insurance proceeds at issue herein.
The plain wording of section 2(e), particularly in view of its heritage in Moore, flatly rebuffs the insurers’ contention, accepted by the circuit court, that the “obligation to pay” the proceeds of a life insurance policy to the Treasurer cannot arise until a beneficiary perfects a claim thereupon. The insurers maintain that their “obligation to pay” under the Act can only be fully understood by considering it in pari materia with the Insurance Code’s regulation of their contractual relationship with the policies’ insureds. Therefore, the argument goes, no beneficiary can enjoy the proceeds to which he or she is entitled without first filing a claim. The mere requirement , of a claim in accordance with the Code, however, does not begin to address the wholly, different question, decided in Moore and present here, regarding duties imposed on the insurers by a regulatory scheme separate and distinct from any obligation under an insurance contract.[4]
*8 With respect to the presumptively abandoned proceeds of a life insurance policy, the plain language of section 2(e) of the West Virginia Uniform Unclaimed Property Act, West Virginia Code § 36-8-2(e) (1997), demonstrates the Legislature’s intent to .affirmatively separate the insurer’s obligation to account for and pay those proceeds, to the Treasurer from the filing of any claim for benefits required by the policy terms. The insurer’s obligation to account for and pay those proceeds is tied instead to the.death of the insured (or the insured’s attainment of the .limiting age), maturing three years thereafter.
Our conclusion arises inexorably from the Legislature’s purposeful bifurcation of the insurer’s obligations under the Act, from those pursuant to the Code in section 2(e) of the former, and it is the only plausible alternative to the claim-filing trigger urged by the insurers. Because the Act in this regard admits of only one interpretation, it is not ambiguous; it was therefore error for the circuit court to construe the Act in pari materia with the inapposite provisions of the Insurance Code directed solely at the contractual relationship between insurer and insured, and not purporting in any manner to govern the conduct of the Treasurer in his role as conservator' for the -'citizenry. ‘ The circuit[1]' court’s ruling treating the provisions of the Insurance Code as controlling' deprived the Act of its full force and effect, contrary to our precedent.[5]
The circuit court referred to recent unpublished decisions in three other states as consistent with Its interpretation of West Virginia law. We do not find them persuasive. In' two of those eases, the court merely ruled that, in the absence of a claim as required by contract, the defendant insurer had no independent duty to its insured or the insured’s beneficiary to search the DMP. See Feingold v. John Hancock Life Ins. Co. (USA), No. 13-10185, 2013 WL 4495126 (D.Mass. Aug. 19, 2013); Andrews v. Nationwide Mut. Ins. Co., No. 97891, 2012 WL 5289946 (Ohio Ct. App. Oct. 25, 2012), review denied 135 Ohio St.3d 1415, 986 N.E.2d 31 (Ohio 2013). Neither opinion addressed, the broader obligation to state governments acting as conservators, established in Moore.and codified in the Act..
The third case, Total Asset Recovery Services, LLC v. Metlife, Inc., No. 2010-CA-3719, 2013 WL 4586450 (Fla.Cir.Ct. Aug. 20, 2013), was a qui tam action alleging fraud on the part of several defendant insurers, based primarily on their retention of unclaimed policy proceeds that might have been payable had they cross-referenced their insureds against the DMF. The court determined that it had no jurisdiction over the dispute with respect to at least one insurer, as its liability had previously been compromised through settlement with the state’s Department of Financial Services (“DFS”). The court therefore dismissed the complaint with prejudice.
The court held in the alternative that dismissal was warranted inasmuch as the insurer had not knowingly avoided any legal obligation, such obligation being a prerequisite to liability under, the Florida False Claims Act. No obligation had arisen, according to the- court, because the state’s unclaimed property law imposes no duty on insurers to search.the DMF or other external databases. The pronouncement of the Circuit Court of Florida on-that point was confirmed-last year in Thrivent Financial for Lutherans v. Department of Financial Services, 145 So.3d 178 (Fla.Dist.Ct.App.2014). In Thrivent, the court of appeals reversed the declaration of the DFS that the state’s Disposition of Unclaimed Property Act rendered the proceeds of life insurance policies due and payable on the death of the insured. Although the statute ' required that proceeds be established “due and payable” exclusively by resort to the insurer’s records, the DFS determined that the law imposed upon insurers the duty to supplement its records by consulting sources such as the DMF. The Thrivent *9 court disagreed, observing that “nothing in the plain language .of [the Florida Act] imposes an affirmative duty on insurers .to search these death records.” Id. at 182.
Likewise,'the West Virginia Uniform Unclaimed Property Act imposes'no'specific duty on insurers to search the Department of Commerce’s Death Master File or any comparable data source. Rather, the Act simply requires insurers generally, as holders of property presumed abandoned, to account for and turn over that property to the Treasurer. We have determined that, in the case of life insurance policy proceeds, the three-year dormancy period leading to the presumption of' abandonment commences with the death of the insured. Each insurer is free to determine how it will investigate and discover whether its insureds are yet living. Depending on the insurer’s resources and the volume of business done in West Virginia, it may find, for instance, that contacting its insureds directly or farming the task out to its agents may produce the desired results in the most economical and, reliable fashion. On the other hand, an insurer-may well choose to review the DMF as the best or most efficient way to perform its duties under the Act.[6] * .
It is thus largely irrelevant that, as asserted by the insurers, “[f]ive of the 15 states adopting the 1995 Model UPA in some form have also recently enacted DMF legislation,” explicitly imposing a duty to search that database. A similar enactment in West Virginia, as made evident by our holding today, would unnecessarily tread upon the insurers’ prerogative to decide how they will comply ■with the Act. The insurers, however, persuaded the circuit court to surmise' that “[s]uch legislation would be redundant or unnecessary if a duty to search already existed in the UPAs adopted by these states.” Cf. United Ins. Co. of Am. v. Commw., Dep’t of Ins., No. 2013-CA-000612-MR, 2014 WL 3973160 (Ky.Ct.App. Aug. 15, 2014) (holding that duty to ■ search DMF imposed by new model legislation applied only to policies issued after statute’s effective date of January 1, 2013).. Were we to assume, however, that the specific, nonexistent “duty to search” could stand as a proxy for the general “duty to comply” unquestionably extant in the Act, the circuit court’s- rationale is faulty. See, e.g., Childers v. Parker’s, Inc., 274 N.C. 256, 162 S.E.2d 481, 484 (1968) (“Whereas it is logical to conclude that an amendment to an unambiguous, statute indicates the intent to change the law, no such inference arises when the legislature amends an ambiguous provision.” (citing 1 Sutherland, Statutory Construction § 1930 (1968 Cum. Supp.))). It is apparent from the hationwide legislative reaction to the prolifération of settlements emanating from the insurers’ conduct, see infra note 9, that our sister states have perceived an ambiguity in their own statutory schemes that they wish to clarify. ,
In' the event that the insurer’s chosen methodology .proves lacking, the Act sets forth a comprehensive remedial scheme to encouragé improvement. To begin with, “[a] holder who fails to report, pay or deliver property within the time prescribed” is liable to the Treasurer for interest on the property at twelve percent annually. W. Va.Code § 36-8-r24(a) (1997). In addition, “for each day the report, .payment, or delivery is withheld,” the Act prescribes a civil penalty of two hundred dollars per day, to a maximum *10 of five thousand dollars. Id. § 36-8-24(b). The penalties for a willful violation of the Act rise to one thousand dollars per day, to a maximum of twenty-five thousand dollars, “plus twenty-five percent of the value of any property that should have been but was not reported.” Id. § 36-8-24(c). The Treasurer has the authority to waive interest and penalties, and “shall waive penalties if the holder acted in good faith and without negligence.” Id. § 36-8-24(e),[7]
The insurers’ alleged failure to report, pay, and deliver property is at the heart of the Treasurer’s complaints in this matter. On remand, after the insurers have been afforded the opportunity to answer the compláints, the circuit court shall permit the Treasurer to exercise his statutory right to examine the. insurers’ records for compliance with the Act. ■See W. Va,Code § S6-8-20(b).[8] If, at the close of discovery and after any dispositive motions, one or more genuine issues remain with respect to the insurers’ conduct, e.g., whether they have complied with the Act, and if not, whether such noncompliance was willful or instead an inadvertent misstep taken in good faith and without negligence, then we expect the circuit court to resolve those issues through rigorously reasoned findings of fact and conclusions of law.[9]
IV. CONCLUSION
Pursuant to the foregoing, we reverse the circuit court’s dismissal order of December *11 27, 2013, and we remand these matters for further proceedings consistent with this opinion.
Reversed and Remanded.
Justice KETCHUM concurs and reserves the right to file a concurring opinion.

. The quoted portion of the Act specifies that policy proceeds are alternatively, payable if the. insured survives to the limiting age, which, we are advised, is typically around age ninety-five. In light of the relative'infrequency of the alternative triggering event, we make scant reference-to it herein..

. For the purposes of this appeal of the circuit court’s dismissal of the Treasurers’ -complaints pursuant to West Virginia Rule of Civil Procedure 12(b)(6), we accept as true the factual allegations of those complaints. See infra Part II.

. The questions presented for resolution are the same with respect to all sixty-three named respondents, twenty-two of which have joined one of three representative briefs on appeal. Lead respondent Nationwide Life Insurance Company jointly submitted a brief with Nationwide Life and Annuity Insurance Company. Monumental - Life Insurance Company and Transamerica Life Insurance Company submitted their own joint brief. The third brief was submitted jointly on behalf of eighteen respondents, including New York Life Insurance Company; Lincoln National Life Insurance Company; Erie Family Life Insurance Company; New York Life Insurance and Annuity Corporation; The Western and Southern Life Insurance Company; Western-Southern Life Assurance Company; Primerica Life Insurance Company;' Farm Family Life Insurance Company; Employees Life Company (Mutual); Ohio National Life Assurance Corporation; Reli-aStar Life Insurance Company;- Physicians Life Insurance Company;. Horace Mann Life Insurance Company; Provident Life & Accident Insurance Company; Pacific Life insurance Company; Colonial Life & Accident Insurance Company; American Family Life Insurance Company of Columbus, GA; ■ and The Lafayette Life Insurance Company. , .
In support of the Treasurer, two .amici curiae have filed briefs. .We acknowledge the individual contributions of Xerox State & Local Solutions, Inc., d/b/a Xerox Unclaimed Property Clearinghouse, and- of National Association of Unclaimed Property Administrators, each of which we thank for its assistance.

. Section 2(e) also informs an accurate construction of the term “property,” defined by the Act as, inter alia, "a fixed and certain interest in intangible personal property that is held, issued or owed in the course of a holder’s business.” W. Va.Code § 36-8-1(13). The Act lists several examples of property,' one 'of which is “[a]n amount due and payable under the terms of an annuity or insurance policy, including policies providing life insurance.” Id. § 36—8—1(13)(vi). Construing the above-quoted excerpts of'section 1(13) in pari materia with section 2(e) in order to ensure that each is given its proper force and effect, we have no trouble concluding that, for purposes of the Act, section 2(e) removes any doubt that a beneficiary’s interest in the proceeds of a life insurance policy becomes sufficiently fixed and certain on the death of the insured and not when a claim is subsequently perfected. We need not decide whether such proceeds are also "due and payable” at death, inasmuch as the list of specific property in section 1(13) is merely illustrative, and not intended to exclude unmentioned examples. See Davis Mem’l Hosp. v. W. Va. State Tax Comm’r, 222 W.Va. 677, 684, 671 S.E.2d 682 (2008) (“[T]his Court has recognized that the term "includes” in a statute is to be dealt with as a word of enlargement.” (citation, alterations, and internal .quotation marks omitted)). Put another way, if we assume for the sake of argument that no proceeds of life insurance policies are ever due and payable until a claim is perfected, such circumstance only confirms those proceeds' status under the Act as "property.” It does not necessarily follow, particularly in consideration of the enactment of section 2(e), that such proceeds cannot sooner qualify as property subject to the Act,

. The circuit court’s misperception that the two statutes should be construed together led it to conclude that the Legislature would have more specifically distanced the "obligation to pay” trigger under the Act from the "due. proof of death” required for claims payment under the Insurance Code had it not intended for the latter to instruct as to the former.. To the contrary, the two enactments govern entirely different situations, and we perceive the Act to be sufficiently specific and precise, particularly in view of the enlightenment provided by section 2(e).

. The insurers warn that the DMF is not infallible, in that "some deaths never show up” in the ■ file, "and living individuals have been listed as dead." Nevertheless, if the Treasurer's com- ■ plaints are to be believed, the insurers find the DMF reliable enough to support their efforts to cease payments on lifetime annuities. Several other practical considerations, according to the insurers, counsel against construing the Act in a manner requiring them to account for life insurance proceeds in the absence of a claim. Among those are worries that insurers will lose their right to .contest payment in the event of suicide or murder-for-hire, fraud in the application, or lack of an insurable interest. In that vein, the insurers contend, a claim serves .as notice. to investigate and assess their liability. We expect, however, that in many cases — particularly involving policies,that have been in force for years— the sudden cessation of premiums being paid will serve as sufficient notice to the insurers that the insured may have died, such that they ought to further investigate. The three years that must thereafter elapse prior to the required remittance to the Treasurer provides sufficient opportunity for an insurer to satisfy itself that the proceeds are properly payable. We imagine that, except for the sheer volume of instances, these situations will prove analogous to those now confronted by the insurers when an insured reaches the policy's limiting age, triggering payment though no claim has been filed. .

. The Treasurer also invites our attention to section 10 of the Act. That section safeguards holders from transfers made in error, instructing that one "who pays or delivers property to the administrator in good faith is relieved of all liability arising thereafter with respect to the property.” W. Va.Code § 36 — 8—10(b) (1997). An insurer acts in good faith for purposes of section 10 if its payment constituted a reasonable attempt to comply with the Act, see id. § 36 — 8—10(a)(1), if it harbored a reasonable belief that the property was abandoned and it was not otherwise in breach of a fiduciaiy obligation owed the property owner, see id. § 36 — 8—10(a)(2), and if "[tjhere is no showing that the records under which the payment or delivery was made did not meet reasonable commercial standards of practice,” id, § 36 — 8—10(a)(3). The Treasurer contends that tire good-faith and reasonableness requirements of section 10 should be extrapolated generally to the Act to impose a duty upon the insurers to proactively use the DMF to comply with their reporting and transfer oblígátions. We decline the Treasurer's invitation to interpret the Act in such a manner, as section 10 pointedly targets transfers that have actually been made, in no way purporting to govern transfers that potentially should be made." Moreover, as we have concluded supra, insurers are charged with no specific duty under the Act to consult the DMF.

. The Treasurer need not institute litigation to . exercise his right to the examination provided for in section 20(b), such examination or audit being subject merely to reasonable notice and conduct at a reasonable time. Given that the question arises in the context of litigation, however, we should note that the bounds of discovery are not necessarily the same as the Treasurer’s section 20(b) examination, and that the circuit court may exercise its sound discretion to permit additional relevant discovery on the part of any party, including the Treasurer. Because the circuit court's dismissal ■ order is reversed and full discovery will be conducted on remand, we do not address the Treasurer's alternative argument that preliminary discovery was required before the circuit court could properly dismiss the complaints.

.There are, we suppose, myriad ways for a holder to show that it has acted in good faith and without negligence. The circuit- court may wish to consider, for- instance, whether the insurers have acted in accordance with standards of commercial reasonableness. In the conduct of such an analysis, it may be relevant whether the insurers, as alleged, have frequently resorted ‘to the DMF to terminate their annuity liabilities. Another item that may, he worthy of evaluation is whether and when the insurers have settled claims in other jurisdictions that have the same or similar unclaimed property scheme as West Virginia. In that regard, we are under the impression that John Hancock entered into a Global Resolution Agreement yq 2011 "with a list of states that now totals at least thirty-five." Devin Hartley, Note, A Billion Dollar Problem: The Insurance Industry's Widespread Failure to Escheat Unclaimed Death Benefits to the States, 19 Conn. Ins. L.J. 363, 391 (2013). We are led to believe that Nationwide, Prudential, MetLife, AIG, and Lincoln Financial executed like agree- . ments .with varying numbers of states in 2012. See id. at 391-92, It is.said that the aggregate of these settlements totals hundreds of millions of dollars, and, if so, one may conclude from the gross conspicuousness of the disputes and their resolution that the insurers have been on notice for some time that similar, meritorious claims are likely present here in West Virginia. Cf. Estate of Bailey, 147 Misc.2d 46, 554 N.Y.S.2d 791, 793 (N.Y.Surr.Ct.1990) (observing that executor of estate could not avail himself of good-faith defense to liability for recovery of Medicaid benefits paid on behalf of decedent where executor took “ostrich approach to the existence of creditors”).

. Devin Hartley, A Billion Dollar Problem: The insurance industry’s widespread failure to escheat unclaimed death benefits to the states, 19 Conn.Ins.L.J. 363 (2012-2013).